No. 22-1160

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

————————

IDEAHUB, INC.,

*Appellant,*

v.

UNIFIED PATENTS, LLC,

*Appellee.*

————————

Appeal from the United States Patent and Trademark Office, Patent Trial and
Appeal Board, *Inter Partes* Review No. 2020-00702

————————

## BRIEF OF APPELLANT
## IDEAHUB, INC.

————————

Kayvan B. Noroozi
NOROOZI PC
11601 Wilshire Blvd., Suite 2170
Los Angeles, CA 90025
Telephone: (310) 975-7074
Facsimile: (844) 975-7074

*Counsel for Appellant*

**CERTIFICATE OF INTEREST**

Counsel for Ideahub, Inc. certifies the following:

1.     The full name of every party represented by me is: Ideahub, Inc.

2.     The name of the real party in interest represented by me is: Access Advance LLC.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: none.

4.     The names of all law firms and the partners or associates who appeared for Appellant before the United States Patent and Trademark Office, or are expected to appear in this Court (and who have not or will not enter an appearance in this case), are: William H. Mandir, Fadi Kiblawi, and John R. Rabena of Sughrue Mion, PLLC; Andrew M. Mason, Joseph T. Jakubek, Kyle B. Rinehart, and Darrell C. Henderson of Klarquist Sparkman, LLP.

5.     The following cases could affect or be affected by this appeal: none.

6.     Counsel has no information to provide pursuant to Rule 47.4(a)(6) and 26.1(b) and (c) as this is not a criminal or bankruptcy case.

Dated:  March 11, 2022          By:          */s/ Kayvan B. Noroozi*
                                              Kayvan B. Noroozi

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

STATEMENT OF THE ISSUES................................................................4

STATEMENT OF THE CASE ..................................................................5

      A.    The '849 Patent ..................................................................5

      B.    The challenged claims.........................................................8

      C.    The Petition and prior art ..................................................9

      D.    The proceedings below and the Board's decisions............11

SUMMARY OF THE ARGUMENT ........................................................15

ARGUMENT.....................................................................................19

STANDARD OF REVIEW ...................................................................19

I.      The Board abused its discretion by resting its decision on an improper "third theory" never set forth in the Petition .................................20

II.     The Board's finding that Kalevo teaches "*using* . . . mathematical expressions" lacks substantial evidence ......................................35

III.    The Board abused its discretion by rejecting the proposed amended claims for lack of written description support................................42

CONCLUSION ..................................................................................57

## TABLE OF AUTHORITIES

**Cases**

*Acceleration Bay, LLC v. Activision Blizzard, Inc.*,
908 F.3d 765 (Fed. Cir. 2018)..................................................23, 24, 33

*AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*,
2021 U.S. App. LEXIS 29547 (Fed. Cir. Sep. 30, 2021) .......................16, 22, 32

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ..........................................................48

*Applications in Internet Time, LLC v. RPX Corp.*,
897 f.3d 1336 (Fed. Cir. 2018) ..........................................................20

*Aqua Products v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017)....................................................19, 51

*Baker Hughes Oilfield Operations, LLC v. Hirshfeld*,
No. 2020-1932, 2021 U.S. App. LEXIS 27816 (Fed. Cir. Sep. 16, 2021) ....55, 57

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015)....................................................55, 57

*Boston Sci. Corp. v. Johnson & Johnson*,
647 F.3d 1354 (Fed. Cir. 2011)....................................................53, 55

*CRFD Research, Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017)..........................................................20

*Dell Inc. v. Acceleron, LLC*,
884 F.3d 1364 (Fed. Cir. 2018)....................................................16, 21, 25

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
64 F.3d 1553 (Fed. Cir. 1995)..........................................................51

*F.E.R.C. v. Triton Oil & Gas Corp.*,
750 F.2d 113 (D.C. Cir. 1984) ..........................................................33

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019)....................................................20, 22, 32, 33

*Hill-Rom Servs. v. Stryker Corp.*,

755 F.3d 1367 (Fed. Cir. 2014)......................................................52, 53

*Hudick v. Wilkie*,
755 F. App'x 998 (Fed. Cir. 2018) ............................................33

*IBG LLC v. Trading Techs. Int'l, Inc.*,
757 F. App'x 1004 (Fed. Cir. 2019) .....................................48

*IBM v. Iancu*,
759 F. App'x. 1002 (Fed. Cir. 2019) .......................17, 36, 42

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016)...............................................35

*Innovative Memory Sys., Inc. v. Micron Tech., Inc.*,
781 F. App'x 1013 (Fed. Cir. 2019) ..............................17, 36

*Intelligent Bio–Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016)..............................20, 24, 31

*Johns Hopkins Univ. v. CellPro*,
152 F.3d 1342 (Fed. Cir. 1998)...............................................49

*Kan. City v. Dep't of Hous. & Urban Dev*,
923 F.2d 188 (D.C. Cir. 1991) ...............................................48

*Kingston Tech. Co. v. SPEX Techs., Inc.*,
798 F. App'x 629 (Fed. Cir. 2020) ...............................24, 32

*Medrad, Inc. v. MRI Devices Corp.*,
401 F.3d 1313 (Fed. Cir. 2005)......................................49, 51

*Microsoft Corp. v. Proxyconn, Inc.*,
789 F.3d 1292 (Fed. Cir. 2015)......................................19, 1

*MModal LLC v. Nuance Communs., Inc.*,
846 F. App'x 900 (Fed. Cir. 2021) ........................................23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...................................................................48

*Nidec Motor Corp. v. Zhonghan Broad Ocean Motor Co.*,
851 F.3d 1270 (Fed. Cir. 2017)................................16, 36, 42

iv

*Qiagen N. Am. Holdings, Inc. v. Handylab, Inc.*,

  2021 U.S. App. LEXIS 32391 (Fed. Cir. Oct. 29, 2021)..............................23, 33

*Qualcomm Inc. v. Apple Inc.*,

  2022 U.S. App. LEXIS 2836 (Fed. Cir. Feb. 1, 2022) .......................................23

*Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*,

  824 F.3d 999 (Fed. Cir. 2016)..................................................................50

*Service v. Dulles*,

  354 U.S. 363 (1957)..........................................................................22, 33

*Sling TV, L.L.C. v. Uniloc 2017 LLC*,

  No. 2021-1651, 2022 U.S. App. LEXIS 2957 (Fed. Cir. Feb. 2, 2022) ........49, 51

*Streck, Inc. v. Research & Diagnostic Sys.*,

  665 F.3d 1269 (Fed. Cir. 2012)...........................................................52, 53, 55

*Uber Techs., Inc. v. X One, Inc.*,

  799 F. App'x 868 (Fed. Cir. 2020) ......................................................49, 51

*UltimatePointer, L.L.C. v. Nintendo Co.*,

  816 F.3d 816 (Fed. Cir. 2016)..................................................................51

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*,

  853 F.3d 1272 (Fed. Cir. 2017)...........................................................16, 24, 32

*Wastow Enters., LLC v. Truckmovers. Com, Inc.*,

  855 F. App'x 748 (Fed. Cir. 2021) ..........................................................50

*Wireless Protocol Innovations, Inc. v. TCT Mobile, Inc.*,

  771 F. App'x. 1012 (Fed. Cir. 2019) ....................................................16, 35, 42

**Statutes**

28 U.S.C. § 1295 ...............................................................................4

35 U.S.C. § 141 ................................................................................4

35 U.S.C. § 142 ................................................................................4

35 U.S.C. § 312 .........................................................................15, 21, 31

35 U.S.C. § 319 ................................................................................4

5 U.S.C. § 706 .........................................................................19, 33, 35, 52

**Regulations**

37 C.F.R. § 42.104.................................................................15, 21, 22, 31

37 C.F.R. § 42.23....................................................................... passim

37 C.F.R. 90.3.............................................................................4

## STATEMENT OF RELATED CASES

There are no cases that could affect or be affected by this appeal.

**INTRODUCTION**

The Board's decision is riddled with errors, self-contradictions, and arbitrary findings devoid of evidentiary support.

The Board's conclusion of unpatentability as to the challenged claims rests on a new, "third theory" of unpatentability as to limitation [1.10] that was presented for the first time in Unified's Reply, and was never disclosed in the Petition. Indeed, Unified's Reply did not so much as cite the Petition when presenting its "third theory" as to limitation [1.10]. And the Board made no finding that Unified's "third theory" as to limitation [1.10] was disclosed in the Petition at all, much less with the specificity required by Congress, this Court's precedents, and the Board's own regulations. The Board's reliance on Unified's "third theory" was an abuse of discretion that this Court should reverse, along with the Board's conclusion of unpatentability, which rests entirely on that "third theory."

The Board's substantive decision as to Unified's "third theory" is also without substantial evidence. Although limitations [1.8] and [1.9] expressly recite a decoder that must make certain determinations "***by using***" certain "mathematical expressions," the Board found those limitations satisfied based on the below figure from the prior art, which plainly does not teach or suggest the ***use*** of any mathematical expressions, but rather only shows a conversion map.

1



*Kalevo* (EX1004), Figure 4 (excerpt)

*Kalevo* (EX1004), Figure 4 (excerpt)

The Board reasoned that because the above mappings ***could be expressed mathematically*** and represent "mathematical relationships," they teach or suggest the claim's requirement of "***using*** . . . mathematical expressions." But nearly everything in the universe—from the distances we travel, to the calories we consume, to the meetings on our calendars—can be expressed mathematically, and represents mathematical relationships. And yet, neither the existence of mathematical relationships nor the ability of being mathematically expressed is

evidence of ***using*** mathematical expressions to make determinations. The Board's reasoning is clearly unreasonable, arbitrary, and fanciful, and involves a record that contains no evidence on which the Board could rationally base its decision.

Compounding its errors, the Board interpreted the same limitation of the challenged claims in ***two diametrically opposite ways*** to find both obviousness and lack of written description. Limitation [1.1] requires "determining an intra mode for a neighboring block of a current block." Whereas the Board accepted Unified's argument that limitation [1.1] is met by the prior art disclosing "the ***same*** determination of the directionality (***i.e., intra mode***) of neighboring blocks" as in the '849 Patent," the Board conversely found that determining the directionality of neighboring blocks as taught in the '849 patent does ***not*** disclose limitation [1.1] for purposes of written description. *Compare* Appx100 (emphasis added); Appx29 (adopting Unified's contentions regarding limitation [1.1] as its own); Appx1350-1351, *with* Appx50, Appx41. In making that finding, the Board not only irreconcilably contradicted itself, it interpreted limitation [1.1] so as to exclude the preferred embodiment of the '849 Patent's ***title*** from the scope of every single claim. *See* Appx54 (titled ". . .Video Decoding Method for Performing Intra-Prediction ***Based on Directionality of Neighboring Block***") (emphasis added). The Board further ignored Unified's repeated statements, and the '849 Patent's express teachings, that methods for "determining an intra mode for a neighboring block"

3

were well-known in the art. And the Board contradicted two of its earlier decisions, in which it had found that "determining an intra mode for a neighboring block" in the context of the '849 Patent *is* met by determining a directionality of a neighboring block. Appx1350-1351; Appx3996-3997.

Accordingly, this Court should reverse the Board's finding of unpatentability, and its finding of lack of written description as to "determining an intra mode for a neighboring block of a current block."

JURISDICTIONAL STATEMENT

This appeal arises from the Patent Trial and Appeal Board's Final Written Decision in *Unified Patents, LLC v. Ideahub, Inc.*, IPR2020-00702, Paper 52 (Sept. 25, 2021). Appx1. Pursuant to 37 C.F.R. 90.3(b)(1), 35 U.S.C. § 142, and 35 U.S.C. § 319, Ideahub, Inc. ("Ideahub") timely appealed. No. 22-1160, Dkt. 1. This Court has jurisdiction under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4).

STATEMENT OF THE ISSUES

I.    Whether the Board abused its discretion by permitting and relying upon a new theory of unpatentability never presented in the Petition.

II.    Whether the Board's conclusion that Kalevo teaches determining the intra mode for a current block "by *using* . . . mathematical expressions" lacks substantial evidence where the Board only found (and Kalevo only teaches) an

4

approach that *can be written* mathematically, not one that *uses* a mathematical expression.

III.   Whether the Board erred in rejecting the proposed amended claims based on a purported lack of written description where:

(a)   the Board's finding rests on a claim interpretation directly contrary to the interpretation it used when comparing the same limitation to the prior art;

(b)   the Board's claim interpretation excludes the preferred embodiment of the patent's *title* from the scope of the issued claims;

(c)   the Board's conclusion contradicts its separate finding and the undisputed evidence that the limitation was "well-known" in the art; and

(d)   the Board's final written decision suddenly and unexpectedly changed its findings as to the limitation, contradicting its *two* earlier decisions on the matter, without providing Ideahub reasonable notice or an opportunity to respond.

## STATEMENT OF THE CASE

### A.   The '849 Patent

U.S. Patent No. 9,641,849 (the '849 Patent), entitled "Video Encoding Apparatus, Video Decoding Apparatus, and Video Decoding Method for Performing Intra-Prediction Based on Directionality of Neighboring Block," is directed to "improving compression efficiency" in video transmission. Appx4.

Digital video files contain a sequence of individual frames that in turn contain pixel data. Appx385. Each frame contains pixels organized into rows and columns, which together form the image in the frame, and these rows and columns are typically divided into small regions called "blocks" of data. *Id.*

Because digital video files are often very large, efficient video transmission to end-users for quick playback over the Internet frequently requires compression. Appx386. On the receiving end, the video data is decompressed (or decoded) for playback at an end-user device. *Id.*

The '849 Patent discloses that "H.264" was a known compression standard that uses "directional intra-prediction" (or simply "intra-prediction" for short) to reduce spatial redundancy within a frame. Appx4. "Spatial redundancy" refers to the "repetition of the same color or object in an image." *Id.* Intra-prediction is a method of compressing image data based on the premise that pixels that are close together are likely to have similar characteristics. Appx387. For instance, a video frame showing a monochromatic sky will have "pixels that are close to one another . . . [that] are likely to have similar characteristics," allowing for prediction of the values of adjacent pixels, and thus reducing "the amount of data necessary for transmission and reconstruction" of an image. Appx5. In more technical terms, "[i]ntra-prediction refers to a method of copying one sub-block in a designated direction using neighboring pixels in upward and leftward directions, predicting

6

values of current sub-blocks, and encoding only the differences between the copied values and the predicted value of the sub-blocks." Appx4-5 (quoting Appx67 (1:54-58)).

The '849 Patent describes an improvement over an aspect of the H.264 compression standard by disclosing an approach that can reduce the amount of data that must be transmitted for decoding. Appx5. The patent explained that under the H.264 standard, intra mode information is transmitted to a decoder in order to allow the decoder to obtain a prediction block and to reconstruct the current block. Appx68 (3:10-15). But transmitting that intra mode information "may act as an overhead increasing the size of a coded bitstream," and thus increase the amount of data required for transmission, "and this is by no means a small amount compared to a result of encoding a residual." *Id.* (3:19-21). The '849 Patent thus proposes to select an intra mode for a current block "on the basis of a directionality of at least one neighboring block that has already been reconstructed before the current block is reconstructed," which eliminates the need for transmitting the intra mode. Appx390 (quoting Appx68 (3:53-4:28)). As the patent explains, "in an example embodiment of the present invention, unlike the conventional H.264, the encoder does not transmit the intra mode information, and the decoder can obtain an optimal intra mode, in which a cost function is minimized on the basis of the directionality of the neighboring blocks that have already been reconstructed

before the current block is reconstructed, for the current block, and thereby

perform the intra-prediction." Appx69 (5:63-6:4).

**B.    The challenged claims**

Claim 1, the sole independent challenged claim, recites:

1.    A video decoding method performed by a video

decoding apparatus, the method comprising:

[1.1] determining an intra mode for a neighboring block of a

current block;

[1.2] determining an intra mode for the current block based on

whether the intra mode for the neighboring block is a directional

mode or a non-directional mode;

[1.3] performing intra-prediction according to the intra mode

for the current block to generate a prediction block for the current

block;

[1.4] obtaining quantization coefficients from an input

bitstream;

[1.5] dequantizing the quantization coefficients to generate

transform coefficients;

[1.6] transforming the transform coefficients to a residual block

for the current block; and

[1.7] adding the prediction block and the residual block to reconstruct the current block,

[1.8] wherein the intra mode for the current block is determined by using a first set of one or more mathematical expressions, if the intra mode for the neighboring block is the non-directional mode,

[1.9] wherein the intra mode for the current block is determined by using a second set of one or more mathematical expressions, if the intra mode for the neighboring block is the directional mode, and

[1.10] wherein the second set of one or more mathematical expressions is different from the first set of one or more mathematical expressions.

Appx72.

## C.    The Petition and prior art

In its Petition, Unified challenged claims 1 and 4 of the '849 Patent as obvious based on the combination of Kalevo and Song. Appx2. Kalevo is a U.S. Patent Application Publication titled "Method for Encoding Images, And An Image Coder." Appx15. It discloses video compression using "spatial prediction for a block" by determining a prediction method for the current block (C) based on one or more of the left neighboring block (L) and the upper neighboring block (U). Appx15-16.

Song is a U.S. Patent Application Publication titled "Method and Apparatus for Image Intra Prediction." Appx16. Song discloses a method for "intra prediction of an image." *Id.*

With respect to limitation [1.1] of claim 1, which recites "determining an intra mode for a neighboring block of a current block," Unified's Petition relied entirely on Kalevo. Appx99-103. Unified alleged Kalevo teaches that limitation because Kalevo "determine[s] the directionality" of neighboring blocks, "which corresponds to determining an intra mode of the neighboring block." Appx101. The Petition likewise stated that "in the context of the '849 Patent, a POSITA would have understood that determining an intra mode for a neighboring block is satisfied by determining the directionality of the neighboring block." Appx100. The Petition additionally stated that "Kalevo describes the same determination of the directionality (***i.e., intra mode***) of neighboring blocks" as the '849 Patent, and meets limitation [1.1] on that basis. Appx100 (emphasis added).

With respect to limitation 1.8, 1.9, and 1.10, which recite a decoder that determines the intra mode for a current block by using one set of mathematical expressions if the neighboring block's intra mode is directional [1.8], and by using another set of mathematical expressions if the neighboring block's intra mode is non-directional [1.9], where the two sets of mathematical expressions are different [1.10], Unified's Petition also relied entirely on Kalevo. Appx121-140. The

Petition provided two theories as to limitations 1.8, 1.9, and 1.10—a "prediction method" theory and a "directional classification" theory. *Id.* Under the Petition's first theory, Kalevo allegedly "uses mathematical expressions included in each prediction method to evaluate the prediction methods and select an applicable one for a current block (step 23 in Fig. 2)." Appx18. Under the Petition's second theory, Kalevo allegedly "uses mathematical expressions to classify the directionality of the neighboring blocks (step 22 in Fig. 2), which is in turn used to determine the intra mode for the current block." Appx18. Unified relied on those same two theories as to limitation 1.10, and did not present any other theory as to that limitation. Appx138-140.

### D.    The post-institution proceedings and the Board's decisions

In its Institution Decision, the Board recognized that the Petition's theory regarding limitation 1.1 relied on "Kalevo's determination of which of the directional or non-directional modes has been used for a neighboring block," Appx1350, as well as Unified's position that the "Specification of the '849 Patent supports its contention that 'determining an intra mode for a neighboring block' can mean determining the directionality of the neighboring block." Appx1351. As the Board further explained, "in the context of the '849 Patent, Petitioner argues that a person of ordinary skill 'would have understood that determining an intra mode for a neighboring block is satisfied by determining the directionality of the

11

neighboring block.'" Appx1351. And the Board acknowledged Unified's argument that "Kalevo describes the same determination of the directionality (i.e., intra mode) of neighboring blocks as in the '849 patent." *Id.* On those bases, the Board found that "Petitioner has made a sufficient showing that the cited prior art teaches or suggests limitation [1.1]" and instituted the trial. Appx1352. With respect to the remaining limitations, the Board recognized Patent Owner's argument and evidence that Kalevo's cited techniques are performed by an encoder, not a decoder as the claims require. Appx1351. But the Board found Unified's Petition and supporting declaration sufficient to warrant institution. Appx1352.

Post-institution, Ideahub's Patent Owner Response demonstrated that neither of the Petition's two theories as to limitation 1.8, 1.9, and 1.10 could prevail. Appx1420-1427. The Petition's "prediction method" theory rested on teachings performed entirely by Kalevo's *encoder*, whereas the claim recites a *decoder*. Appx18. And Ideahub proved that the Petition's "directional classification" theory also failed because Kalevo's directional classification method does not choose between sets of mathematical expressions for determining the intra mode of the current block according to the determined intra mode for the neighboring block, as the limitations require. *Id.* Instead, Kalevo uses its "directional classification" approach to determine the directionality of the neighboring block itself, not that of the current block. *Id.*

In addition, Ideahub presented the Board with contingent amended claims 19 (as a substitute for claim 1 to the extent found unpatentable) and 20 (as a contingent substitute for claim 4). Appx1451-1473. The proposed amended claims retained limitation 1.1's requirement of "determining an intra mode for a neighboring block of a current block." Appx1470. Despite its numerous contrary statements in its Petition, Unified challenged the patentability of the contingent amended claims on the basis that the limitation "determining an intra mode for a neighboring block of a current block" lacks written description support in the '849 Patent and its underlying application. Appx3017-3022. Ideahub sought a Preliminary Guidance from the Board in order to evaluate whether its contingent amended claims required further revisions or additional supporting argument or evidence. Appx3992.

The Board's Preliminary Guidance rejected Unified's contention, and agreed with Ideahub that limitation 19.1 has written description support in the '849 Patent and underlying U.S. Patent Application 15/260,240 ("the '240 Application"). Appx3996-3997. In particular, the Board found that Equation 2 and the associated teachings of the '240 Application disclose determining the intra mode of a neighboring block. Appx3997 (finding that "the variable 'i' is referenced as . . . the intra mode of the neighboring block.").

Given the Board's findings, Ideahub submitted a Revised Motion to Amend addressing other aspects of the Board's Preliminary Guidance but leaving limitation 19.1 unchanged. Appx4040-4066. Ideahub did, however, provide a further declaration from its expert, Dr. Clifford Reader, Appx4067, who explained that Equation 2 as disclosed in the '240 Application teaches "a cost function analysis to determine an intra mode for the current block" by using "an intra mode (i) determined for the neighboring block," i.e., the "directionality" determined for the neighboring block, which the '849 Patent uses "interchangeably" with "intra mode." Appx4072-4079 (citing and quoting Appx2213:14-16).

The Board's Final Written Decision did not substantively discuss Unified's theory as to limitation 1.1 based on Kalevo, but rather simply accepted Unified's assertion that determining a directionality of a neighboring block, as allegedly taught in Kalevo, meets "determining an intra mode for a neighboring block" as recited in limitation 1.1. Appx29 ("we adopt Petitioner's contentions regarding limitation[ ] [1.1] . . . as our own") (citing Appx99-103).

With respect to limitations 1.8, 1.9, and 1.10, the Board did not disagree with Ideahub's argument and evidence refuting the Petition's "prediction method" and "directional classification" theories. Appx18. And the Board made no finding accepting either theory. Instead, the Board relied upon a "third theory" articulated in Unified's Reply brief, which the Board found to be adequately disclosed in the

14

Petition, and concluded unpatentability on that basis. Appx18-29. In particular, the Board found that although Kalevo does not teach the use of any mathematical expressions, as limitations 1.8 and 1.9 require, Kalevo's Figure 4 and the associated teachings disclose conversion mappings that ***could be*** expressed as mathematical functions, and represent mathematical ***relationships***, which the Board deemed sufficient to meet the claim's requirement of determining an intra mode for a current block "by ***using*** . . . mathematical expressions." Appx26-27.

The Board's Final Written Decision also rejected the contingent amended claims. Appx50. Contradicting its earlier Preliminary Guidance, its Institution Decision, Unified's Petition, and its own findings as to limitation 1.1 earlier in the Final Written Decision, the Board found that the limitation "determining an intra mode for a neighboring block of a current block," as recited in the original issued claims and contingent amended claim 19, lacks written description support because it found that the '849 Patent's teachings regarding determining the directionality of neighboring blocks do not teach "determining an intra mode for a neighboring block." Appx40-41, Appx50.

## SUMMARY OF THE ARGUMENT

The Board lacks discretion to permit and rely upon a new theory of unpatentability that was never presented in the Petition. *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018); 35 U.S.C. § 312(a)(3); 37 C.F.R. § 42.104(b)(4)-(5);

37 C.F.R. § 42.23(b); *Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) ("[T]he Board was obligated to dismiss Dell's untimely argument given that the untimely argument in this case was raised for the first time during oral argument."); *Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1286-87 (Fed. Cir. 2017) ("Shifting arguments in this fashion is foreclosed by statute, our precedent, and Board guidelines"). Instead, the Board may only allow a petitioner to "reinforce[ ] . . . a point already made with the required support in the petition." *AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, 2021 U.S. App. LEXIS 29547, at *19 (Fed. Cir. Sep. 30, 2021) (gathering and discussing cases). The Board abused its discretion by permitting and relying upon Unified's "third theory" as to limitation [1.10], which the Petition did not disclose.

The Board's decision of unpatentability is also not supported by substantial evidence. This Court will not accept the Board's conclusion of unpatentability where it rests on evidence that fails to show that an aspect of the claim was met. *Wireless Protocol Innovations, Inc. v. TCT Mobile, Inc.*, 771 F. App'x. 1012, 1016-18 (Fed. Cir. 2019) (reversing Board's decision because "the Board cited no reasonable support" for its conclusion that the prior art met the "only after" limitation of the claim); *Nidec Motor Corp. v. Zhonghan Broad Ocean Motor Co.*, 851 F.3d 1270, 1273-74 (Fed. Cir. 2017) (reversing because the challenged claim required the recited signal to be "in the rotating frame of reference," whereas the

Board relied upon prior art that did not teach a signal in a rotating frame of reference); *IBM v. Iancu*, 759 F. App'x. 1002 (Fed. Cir. 2019) (reversing because there was "no substantial evidence to support the Board's finding that Mellmer teaches" the "single-sign-on limitation" of the claims); *Innovative Memory Sys., Inc. v. Micron Tech., Inc.*, 781 F. App'x 1013, 1017-18 (Fed. Cir. 2019) (concluding that "the Board's analysis ignored the requirements of the claim," and made no findings that actually met every limitation). Whereas the challenged claims require a decoder to make determinations "***by using***" certain "mathematical expressions," the Board found that requirement met based merely on evidence of ***relationships that could be expressed mathematically***. The fact of a mathematical relationship that could be expressed mathematically is not evidence of making determinations "***by using*** . . . mathematical expressions," as the claims recite. The Board's findings do not satisfy the claims, and cannot provide substantial evidence for its conclusion of unpatentability.

The Board's conclusion that the limitation "determining an intra mode for a neighboring block of a current block" lacks written description, and its decision to reject the contingent amended claims on that basis, is both legally and factually reversible error. When comparing that same limitation against the prior art, the Board found the limitation met based on Unified's assertion that determining the ***directionality*** of a neighboring block meets determining the ***intra mode*** of the

17

neighboring block. Appx29 ("we adopt Petitioner's contentions regarding limitation[ ] [1.1] . . . as our own.") (citing Appx99-103, among other passages); Appx100 ("in the context of the '849 Patent, a POSITA would have understood that determining an intra mode for a neighboring block is satisfied by determining the directionality of the neighboring block."); *id.* ("Kalevo describes the same determination of the directionality (***i.e., intra mode***) of neighboring blocks" as the '849 Patent) (emphasis added). But when comparing the exact same language to the written description of the '849 Patent, the Board conversely found that the '849 Patent "does not describe the determination of a neighboring block's intra mode," Appx50, because, in the context of the '849 Patent, "*directionality* and *intra mode* are . . . distinct concepts" that "are not interchangeable . . . ." Appx41 (emphasis original). That second finding not only irrefutably contradicts the Board's conclusion that "Kalevo describes ***the same*** determination of directionality (***i.e., intra mode***) of neighboring blocks" as the '849 Patent, Appx100 (emphasis added); Appx29 (Board adopting Appx99-103 "as its own"), it also rests on a claim interpretation that excludes the embodiment of the '849 Patent's ***title*** from the scope of all claims—a clearly absurd result. Appx54 (titled ". . . Video Decoding Method for Performing Intra-Prediction ***Based on Directionality of Neighboring Block***") (emphasis added). The Board's decision also ignores Unified's own repeated statements, and the patent's express teachings, that

18

"determining an intra mode for a neighboring block" was "well-known" in the art—a fact that precludes a finding of lack of written description. And the Board's decision represented a complete reversal of its own prior findings in two earlier decisions, without providing Ideahub any notice of such a shift or any reasonable opportunity to respond, to Ideahub's significant prejudice.

The Board's decision should be reversed.

## ARGUMENT

### STANDARD OF REVIEW

This Court will set aside the PTAB's decision of unpatentability where the PTAB's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1306 (Fed. Cir. 2015).

"[A]n agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious within the meaning of 5 U.S.C. § 706, which governs review of agency adjudications." *Aqua Products v. Matal*, 872 F.3d 1290, 1325-26 (Fed. Cir. 2017).

The Board abuses its discretion if its decision is "(1) clearly unreasonable, arbitrary, or fanciful; (2) is based on erroneous conclusions of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Microsoft*, 789 F.3d at 1306.

19

Obviousness is a question of law based on subsidiary findings of

fact. *Intelligent Bio–Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366

(Fed. Cir. 2016). This Court reviews the Board's legal conclusions de novo, and its

factual findings for substantial evidence. *CRFD Research, Inc. v. Matal*, 876 F.3d

1330, 1340 (Fed. Cir. 2017). "[S]ubstantial evidence review requires an

examination of the record as a whole, taking into account both the evidence that

justifies ***and detracts*** from an agency's opinion." *Applications in Internet Time,*

*LLC v. RPX Corp.*, 897 f.3d 1336, 1356 (Fed. Cir. 2018) (emphasis added). "The

Board's selective weighing of the record evidence does not pass muster under the

APA" under substantial evidence review. *Id.* at 1353.

The Board's decision to allow new evidence and argument post-institution is

reviewed for abuse of discretion. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d

1324, 1331 (Fed. Cir. 2019).

## I.    The Board abused its discretion by resting its decision on an improper "third theory" never set forth in the Petition

As the Supreme Court has held, "the petitioner's petition . . . is supposed to

guide the life of the litigation," *id.* at 1355-56, and is "the centerpiece of the

proceeding both before and after institution." *SAS Institute Inc. v. Iancu*, 138 S. Ct.

1348, 1358 (2018). Thus, "the expedited nature of IPRs bring with it an obligation

for petitioners to make their case in their petition to institute." *Intelligent Bio-*

*Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016). It

is therefore "of the utmost importance that petitioners in IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'" *Id.* (quoting 35 U.S.C. § 312(a)(3)). To that end, the Board's own regulations require that a petition "must specify where each element of the claim is found in the prior art patents or printed publications relied upon" and state "the relevance of the evidence to the challenge raised, including identifying specific portions of the evidence that support the challenge." 37 C.F.R. § 42.104(b)(4)-(5). And the Board's regulations likewise forbid a petitioner from presenting new theories of unpatentability not set forth in its petition. 37 C.F.R. § 42.23(b).

Although the Board has discretion to govern the proceedings before it, the Board does not have discretion to permit and rely upon a new theory of unpatentability presented for the first time after institution. *SAS Institute*, 138 S. Ct. at 1355-56, 1358 ("the petitioner's petition . . . is supposed to guide the life of the litigation," and is "the centerpiece of the proceeding both before and after institution."); *Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) ("[T]he Board was obligated to dismiss Dell's untimely argument given that the untimely argument in this case was raised for the first time during oral argument."). Congress's enabling statute and the Board's own regulations forbid new theories post-institution. 35 U.S.C. § 312(a)(3) (requiring petition to identify

its theories of unpatentability as to each claim "with particularity"); 37 C.F.R. §

42.104(b)(4)-(5) (requiring petition to specify "where each element of the claim is

found in the prior art patents or printed publications relied upon"); 37 C.F.R. §

42.23(b) (precluding new unpatentability theories in petitioner's reply); *Service v.*

*Dulles*, 354 U.S. 363, 388 (1957) ("[A]n agency is bound by its regulations.");

*Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are

affected, it is incumbent upon agencies to follow their own procedures.").

This Court has thus consistently held that a petitioner's reply brief may not

present new theories of unpatentability, but instead may only elaborate on existing

theories stated in the petition. *See*, *e.g.*, *AMC Multi-Cinema, Inc. v. Fall Line*

*Patents, LLC*, 2021 U.S. App. LEXIS 29547, at *19 (Fed. Cir. Sep. 30, 2021)

(holding that this Court must distinguish "impermissible new argument or evidence

from permissible reinforcement . . . of a point already made with the required

support in the petition," and rejecting petitioner's attempt to use its reply to

introduce "a change of legal argument, not fairly understood to have been

adequately presented in the relevant section of the petition itself.").

Thus in *Henny Penny*, 938 F.3d at 1331, this Court held that "an IPR

petitioner may not raise," after institution, "an entirely new rationale for why a

claim would have been obvious." There, the petition proposed to modify

Kaufmann to include the processor/sensor of Iwaguchi for measuring TPMs. *Id.*

22

But in its reply, petitioner additionally proposed to use measured electrical parameters from Kaufmann's own sensor to calculate TPM levels. *Id.* This Court refused to allow that new theory because it was neither disclosed in the petition nor in the initial expert declaration. *Id*. Likewise, in *Qualcomm Inc. v. Apple Inc.*, 2022 U.S. App. LEXIS 2836 (Fed. Cir. Feb. 1, 2022), this Court refused to allow Apple's post-institution argument regarding an additional motivation to combine that was not found in the petition. *Id.* at \*19 ("Apple's petition contained a single paragraph discussing the motivation to combine Doyle with Steinacker, focusing on Doyle's relatively stable trip point. Absent from that paragraph, and the entire petition, is any mention or argument related to hysteresis as a motivation to combine these references."). Numerous other decisions further confirm that a petitioner may not raise new obviousness arguments and evidence post-institution. *See, e.g.*, *Qiagen N. Am. Holdings, Inc. v. Handylab, Inc.*, 2021 U.S. App. LEXIS 32391, at \*10-12 (Fed. Cir. Oct. 29, 2021) (rejecting petitioner's attempt to introduce new evidence with its reply because the evidence could not "be tied to a non-conclusory assertion in the original Petition" and the "Petition did not include any argument or evidence that using a microfluidic PCR chip with a cartridge was routine and predictable as of the priority date"); *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 775 (Fed. Cir. 2018) (rejecting petitioner's post-institution theory because "the petitioner is master of its complaint") (quoting

*SAS Inst.*, 138 S. Ct. at 1355); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (rejecting argument "raised for the first time in IBS's reply brief and expert declaration"); *Kingston Tech. Co. v. SPEX Techs., Inc.*, 798 F. App'x 629, 635 (Fed. Cir. 2020) ("We acknowledge that the Board's rules prohibit a petitioner from submitting new evidence or new argument in reply that the petitioner could have presented earlier. Indeed, we have repeatedly endorsed that proposition.") (internal citations omitted).

Notably, in *Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1286-87 (Fed. Cir. 2017), this Court made clear that a petitioner may not present a new theory of unpatentability in its reply brief even if that new theory is "responsive" to a criticism raised by the patent owner. There, the petition had relied on Oselin's common working frequency embodiment to allege obviousness of claim 6. Patent owner Wasica attacked that theory as deficient. In its reply, Petitioner Continental argued "that one of ordinary skill in the art would have looked to a different passage of Oselin . . . and would then have modified Oselin to use a constant-frequency modulation scheme as taught in other references." *Id.* at 1286-87. This Court rejected that approach, noting that Continental's arguments did not seek to reaffirm the petition, but instead sought to pivot to a new theory. *Id.* ("Rather than explaining how its original petition was correct, Continental's subsequent arguments amount to an entirely new theory of *prima facie* obviousness absent

24

from the petition. Shifting arguments in this fashion is foreclosed by statute, our precedent, and Board guidelines.") (citing 35 U.S.C. § 312(a)(3); *Intelligent Bio-Sys.*, 821 F.3d at 1369-70; *Dell v. Acceleron*, 818 F.3d at 1301).

Here, the Board violated the enabling statute, its own regulations, Supreme Court precedent, and this Court's repeated precedents by allowing Unified to shift to an entirely new unpatentability argument for the first time on reply, and by relying on Unified's new argument to find unpatentability.

Limitations 1.8, 1.9, and 1.10 of claim 1 recite a decoder determining the intra mode for a current block by using one set of mathematical expressions if the neighboring block's intra mode is directional [1.8], and by using another set of mathematical expressions if the neighboring block's intra mode is non-directional [1.9], where the two sets of mathematical expressions are different [1.10].

Unified's petition stated only two complete theories as to those limitations. Appx121-140. Under the Petition's first theory, Kalevo allegedly "uses mathematical expressions included in each prediction method to evaluate the prediction methods and select an applicable one for a current block (step 23 in Fig. 2)." Appx18. Patent Owner's Response explained and demonstrated that this first theory cannot meet limitations 1.8-1.10 because only Kalevo's *encoder* performs its prediction method, whereas the claim recites a *decoder*. *Id*. The Board's final written decision recognized Ideahub's argument, and did not disagree. *Id*. And the

25

Board made no finding accepting Unified's "prediction method" theory. *Id.* Unified's reply brief also did not substantively address or rebut Ideahub's argument, and thus conceded that Ideahub's position was correct. 37 C.F.R. § 42.23(a) ("Any material fact not specifically denied may be considered admitted.").

Under the Petition's second theory, Kalevo allegedly "uses mathematical expressions to classify the directionality of the neighboring blocks (step 22 in Fig. 2), which is in turn used to determine the intra mode for the current block." Appx18. Patent Owner explained and demonstrated that this second "directional classification" theory also fails because it does not choose between sets of mathematical expressions for determining the intra mode of the ***current*** block according to the determined intra mode for the neighboring block, as the limitations require. *Id.* Instead, Kalevo uses its "directional classification" approach to determine the directionality of the ***neighboring*** block itself, not that of the ***current*** block. *Id.* The Board again recognized Ideahub's argument as to this second theory, and again did not disagree or make any contrary finding. *Id.* And Unified once again did not substantively address Ideahub's argument in its reply, thus conceding the issue. 37 C.F.R. § 42.23(a).

Instead, the Board and Unified sidestepped the Petition's failures, and Ideahub's arguments, by relying on a "third theory" as to limitation 1.10, articulated for the first time in Unified's Reply brief. Appx18.

Under Unified's new "third theory," Unified argued that Kalevo meets limitation 1.10 because its Fig. 4 teaches two sets of conversion mappings that are different from one another, *i.e.*, the two mappings convert different starting inputs (D8-D10 versus D5-D7) to different final outputs (C4 versus C5-C6). Appx23-24; Appx3918-3919.



*Kalevo* (EX1004), Figure 4 (excerpt)

*Kalevo* (EX1004), Figure 4 (excerpt)

Unified did not cite ***any aspect*** of the Petition or its initial expert declaration as allegedly disclosing this theory as to limitation 1.10. Appx3918-3919 (stating, without citation, that "the mappings from D5-D7 to C4, which correspond to the *second set* [ ] [are] *different* than the first set (the mappings from D8-D10 to C5-C6. . .), consistent with limitation [1.10].").

Patent Owner challenged Unified's new theory as to limitation 1.10 on the basis that "Petitioner never alleged 'with particularity' that Kalevo's class mapping

corresponds to the claimed _**different**_ first _**and second**_ sets of mathematical expressions." Appx4016 (emphases original).

The Board's Final Written Decision acknowledged uncertainty as to whether the Petition had disclosed Unified's third theory as to limitation 1.10, but concluded the Petition's discussion of limitation 1.10 "does explain how classes C1-C6 are not the same in that they involve different underlying rules." Appx25 (citing Appx138-140). On that basis, the Board implicitly concluded that the Petition had disclosed Unified's third theory as to limitation 1.10. _Id._

The Board's finding was error, and is not supported by substantial evidence. In the Petition and the accompanying expert declaration, Unified at no point argued that limitation 1.10 is met because the mappings in Kalevo's figure 4 for non-directional classes D8-D10 are different than the mappings for directional classes D5-D7. Appx138-140. That is why Unified's Reply brief made _**no citation**_ to the Petition or its original expert declaration when it presented that new theory. _See_ Appx3918-3919 (presenting theory without any citation to Petition).

Instead, as explained above, the Petition and the original expert declaration had relied on two entirely different theories regarding limitation 1.10.

_First_, the Petition relied on Kalevo's _**prediction methods**_ (not Figure 4's conversion mappings), arguing that Kalevo teaches two sets of mathematical

expressions to evaluate various prediction methods, where the two sets of expressions do not entirely overlap. Appx138-139.

*Second*, the Petition relied on Kalevo's ***directional classification*** approach, arguing that Kalevo uses mathematical expressions to compute the average absolute directional gradient of non-directional blocks, and teaches the use of an additional equation with respect to directional blocks (Kalevo's equation 2), thus allegedly disclosing two "different" sets of mathematical expressions as required by limitation 1.10. Appx139-140.

The Petition thus plainly did not disclose a "third" theory as to limitation 1.10 that compares Figure 4's conversion mappings for non-directional blocks (D8-D10 to C5-C6) to its mappings for directional blocks (D5-D7 to C4).

The Board's implicit contrary finding is not supported by the evidence, and is clearly erroneous and an abuse of discretion. The Board cited to the Petition at pages 55 to 57, Appx25, but those pages only set forth the "prediction methods" and "directional classification" theories discussed above, which Unified abandoned and the Board never accepted. *See* Appx138-140. As demonstrated, neither of those theories discloses or even reasonably relates to Unified's "third theory" that Kalevo meets limitation 1.10 by providing different sets of conversion mappings in Figure 4. The Petition nowhere describes or even alludes to any such third theory.

The Board's attempt to generalize the two specific theories the Petition did disclose likewise fails to support its decision. The Board found that the Petition's two disclosed theories stand for the generic proposition that "classes C1-C6 . . . involve different underlying rules." Appx25. From that premise, the Board implicitly found—without any reasoning or explanation—that Unified had adequately disclosed its new third theory regarding limitation 1.10. *Id.*

The Board's reasoning, however, fails to support its implicit conclusion because the Board's regulations and enabling statute require the petition to set forth theories with *specificity*, not generalizations. 35 U.S.C. § 312(a)(3) ("A petition . . . may only be considered if . . . the petition identifies, in writing and with particularity, . . . the evidence that supports the grounds for the challenge to each claim"); 37 C.F.R. § 42.104(b)(4)-(5) (a petition "must specify ***where*** each element of the claim is found in the prior art patents or printed publications relied upon" and state "the relevance of the evidence to the challenge raised, including identifying ***specific portions of the evidence*** that support the challenge.") (emphases added); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) ("the expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to institute" and it is therefore "of the utmost importance that petitioners in IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence

that supports the grounds for the challenge to each claim.'"); *Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1286-87 (Fed. Cir. 2017) ("Rather than explaining how its original petition was correct, Continental's subsequent arguments amount to an entirely new theory of *prima facie* obviousness absent from the petition. Shifting arguments in this fashion is foreclosed by statute, our precedent, and Board guidelines."); *Kingston Tech. Co. v. SPEX Techs., Inc.*, 798 F. App'x 629, 635 (Fed. Cir. 2020) ("We acknowledge that the Board's rules prohibit a petitioner from submitting new evidence or new argument in reply that the petitioner could have presented earlier. Indeed, we have repeatedly endorsed that proposition.") (internal citations omitted); *AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, 2021 U.S. App. LEXIS 29547, at *19 (Fed. Cir. Sep. 30, 2021) (holding that this Court must distinguish "impermissible new argument or evidence from permissible reinforcement . . . of a point already made with the required support in the petition," and rejecting "a change of legal argument, not fairly understood to have been adequately presented in the relevant section of the petition itself."); *Henny Penny*, 938 F.3d at 1331 (refusing to allow, post-institution, "an entirely new rationale for why a claim would have been obvious"); *Qualcomm Inc. v. Apple Inc.*, 2022 U.S. App. LEXIS 2836, at * 19 (Fed. Cir. Feb. 1, 2022) (rejecting a motivation to combine that was "[a]bsent from [the relevant] paragraph" of the petition "and the entire petition"); *Qiagen N. Am. Holdings, Inc.*

*v. Handylab, Inc.*, 2021 U.S. App. LEXIS 32391, at *10-12 (Fed. Cir. Oct. 29, 2021) (rejecting new evidence submitted with petitioner's reply because it could not "be tied to a non-conclusory assertion in the original Petition"); *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 775 (Fed. Cir. 2018) (rejecting petitioner's post-institution theory because "the petitioner is master of its complaint") (quoting *SAS Inst.*, 138 S. Ct. at 1355).

Here, the Petition nowhere describes, with any particularity or specificity, the theory that limitation 1.10 is met because Kalevo's Figure 4 teaches different conversion mappings for certain non-directional blocks (D8-D10 to C5-C6) compared to certain directional blocks (D5-D7 to C4). The Board thus abused its discretion in permitting and relying upon that new theory. *Service v. Dulles*, 354 U.S. 363, 388 (1957) ("[A]n agency is bound by its regulations."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Hudick v. Wilkie*, 755 F. App'x 998, 1007 (Fed. Cir. 2018) (holding that when an agency's decision conflicts with its own regulations, the decision constitutes an abuse of discretion that this Court vacates under 5 U.S.C. § 706) (citing *F.E.R.C. v. Triton Oil & Gas Corp.*, 750 F.2d 113, 116 (D.C. Cir. 1984)); *Henny Penny*, 938 F.3d at 1331 (Board abuses its discretion if its decision is "clearly unreasonable, arbitrary, or

fanciful," "rests on clearly erroneous fact finding," or "involves a record that contains no evidence on which the Board could rationally base its decision.").

Moreover, Ideahub was prejudiced by the introduction of Unified's untimely theory for the first time in its Reply brief. Ideahub's only opportunity to substantively respond to Unified's new theory was in Ideahub's sur-reply. The Board's rules, however, forbid presenting new evidence from Ideahub's expert in the sur-reply. 37 C.F.R. § 42.23(b). Ideahub thus had no opportunity to rebut Unified's new "third theory," and Unified's new expert declaration, through expert testimony of its own. Thus, contrary to the Board's conclusion, Appx26, Ideahub did not have an "adequate" opportunity to respond to Unified's new theory as to limitation 1.10.

Further, the Board's justification for its reliance on Unified's new theory is contradicted by other aspects of its decision. Specifically, the Board stated that it was proper to consider Unified's new theory because Unified's new Reply arguments were  allegedly responding "to the narrow constructions . . . advanced by Patent Owner." Appx26. But only pages before, the Board had stated that addressing Patent Owner's requested claim constructions was not "necessary for this Final Written Decision," and had refused to consider the requested constructions on that basis. Appx11. The Board's decision to entirely ignore Ideahub's requested claim constructions as not "necessary" to resolving the

parties' disputes, Appx11, cannot be reconciled with its decision to allow Unified's new reply arguments and evidence as "respond[ing]" to Ideahub's claim construction proposals. Appx26. Indeed, since the Board did not even address Ideahub's proposed constructions, there was certainly no basis for the Board to consider and rely upon new arguments from Unified that were, according to the Board, merely directed at Ideahub's claim constructions.

The Board's decision to allow and rely upon Unified's new "third theory" as to limitation 1.10 was thus an abuse of discretion, which this Court should reverse.

Because the Board made no finding that Unified's original two theories demonstrated unpatentability, and because the Board and Unified never disagreed with Ideahub's argument and evidence that Unified's original two theories did *not* prove unpatentability, reversing the Board's reliance on Unified's "third theory" also requires reversal of its ultimate conclusion of unpatentability.

## II. The Board's finding that Kalevo teaches "*using . . .* mathematical expressions" lacks substantial evidence

This Court must set aside the Board's conclusion of unpatentability where the Board's decision is not supported by substantial evidence. *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (quoting 5 U.S.C. § 706(2)(E)).

The Board's conclusion of unpatentability lacks substantial evidence where the Board's findings as to the prior art do not meet every limitation of the claims. *Wireless Protocol Innovations, Inc. v. TCT Mobile, Inc.*, 771 F. App'x. 1012,

1016-18 (Fed. Cir. 2019). Thus in *Wireless Protocol Innovations*, the challenged

claim required a client device (or "CPE") to transition from one state to another

"only *after*" receiving bandwidth from the base station. *Id.* at 1016. Interpreting

Fig. 9 of the Abi-Nassif reference, the Board found that Abi-Nassif taught

transitioning from an "inactive" state to an "active" state after receiving a

bandwidth grant. *Id.* This Court disagreed, and found that "the Board cited no

reasonable support" for its conclusion that Abi-Nassif met the "only after"

limitation, and thus reversed for lack of substantial evidence. *Id.* at 1017-18.

Similarly in *Nidec Motor Corp. v. Zhonghan Broad Ocean Motor Co.*, 851

F.3d 1270 (Fed. Cir. 2017), this Court reversed the Board's conclusion of

unpatentability for lack of substantial evidence because the challenged claim

required the recited signal to be "in the rotating frame of reference," whereas the

Board relied upon prior art that did not teach a signal in a rotating frame of

reference. *Id.* at 1273-74.

In *IBM v. Iancu*, 759 F. App'x. 1002 (Fed. Cir. 2019), this Court again

reversed the Board's conclusion of unpatentability because it found "no substantial

evidence to support the Board's finding that Mellmer teaches" the "single-sign-on

limitation" of the claims. *Id.* at 1008-12.

And in *Innovative Memory Sys., Inc. v. Micron Tech., Inc.*, 781 F. App'x

1013 (Fed. Cir. 2019), this Court likewise set aside the Board's conclusion of

unpatentability because "the Board's analysis ignored the requirements of the claim," and made no findings that actually met every limitation. *Id.* at 1017-18.

Here, the Board's decision lacks substantial evidence to support its finding that Kalevo teaches or suggests determining the intra mode of the current block "by ***using*** . . . mathematical expressions," as recited in limitations 1.8 and 1.9.

According to Unified's "third" theory, Kalevo's conversion mapping as illustrated in Kalevo's Figure 4 (shown below) "is a mathematical expression and can be written as an equation." Appx22 (quoting Appx3967-3968).



*Kalevo* (EX1004), Figure 4 (excerpt)

*Kalevo* (EX1004), Figure 4 (excerpt)

More specifically, Unified alleged that the above conversions are "surjective mapping[s]" that "***correspond to*** a mathematical operation of many-to-

one mapping of discrete mathematics." Appx3965 (emphasis added). Unified

further alleged that because Kalevo's Figure 4 provides a sequence of variables

(e.g., D5) connected by an "operator" (the arrow) to "indicate a desired

computation," (e.g., D5 mapped to C4), Kalevo's mappings are "mathematical

expressions." Appx3970 (citing Ex. 1021 ¶ 60). Unified also argued that the

mappings in Kalevo's Figure 4 "*can be represented using an equation*," *e.g.*, $f_1 =$

$\{(D8, C5)\}$ and $f_2 = \{(D5, C4), (D6, C4), (D7, C4)\}$. Appx3968 (emphasis added).

In response, Ideahub refuted Unified's attempt to convert the simple, visual

mappings of Kalevo's Figure 4 into non-existent "mathematical expressions."

Appx4015-4019. As Ideahub explained, Unified's allegation that Kalevo's

conversion mappings "correspond to a mathematical operation" "does not explain

how the decoder *uses* a particular mathematical expression (or sets thereof)."

Appx4016-4017 (emphasis original). Stated otherwise, even if Kalevo's Figure 4

conversion mappings do indeed "*correspond to* a mathematical operation of many-

to-one mapping," that is not evidence that Kalevo *uses* any specific mathematical

expression to perform its mappings, as the challenged claims require. Appx4017.

Crucially, as Ideahub pointed out, Kalevo never teaches the use of the

mathematical expressions $f_1 = \{(D8, C5)\}$ and $f_2 = \{(D5, C4), (D6, C4), (D7, C4)\}$,

or any other mathematical expressions, to perform its conversion mappings.

Appx26. Instead, Unified and its expert merely fabricated those mathematical

expressions to show that Kalevo's conversion mappings ***can be written*** using mathematical functions. *Id.*; Appx4017-4018. Moreover, Ideahub explained that the use of variables and arrows in Kalevo's Figure 4 does not render those conversion mappings into "mathematical expressions"; rather, Kalevo's Figure 4 states simple Boolean conditions to output logical statements (e.g., "*If* D8, *then* C5"), which are not mathematical expressions any more than the condition "*If* seeds, *then* fruit." Appx4017-4018.

The Board nonetheless accepted Unified's arguments on two bases. First, while the Board conceded that Kalevo does not disclose functions such as $f_1 = \{(D8, C5)\}$, it found that fact "beside the point" because "Kalevo would suggest these functions to a person of ordinary skill." Appx26 (citing Appx3075 ¶¶ 61-62). Second, the Board found that "the relationships shown in Figure 4" are "mathematical" because they "correspond to surjective mapping (i.e., many-to-one mapping . . .), which is a concept known in discrete mathematics." Appx27.

The Board abused its discretion in both respects, and its findings lack substantial evidence.

***First,*** the evidence of record does not support the conclusion that Kalevo would suggest the use of mathematical expressions corresponding to its Figure 4 mappings to an ordinary artisan. Dr. Freedman and Unified never made any such contention; they merely stated that Kalevo's teachings "can be represented by"

various mathematical functions. Appx3075 ¶ 61. The allegation that Kalevo's

Figure 4 *can be* written as mathematical functions is not evidence that Kalevo's

Figure 4 "fairly suggests" the *use* of mathematical functions, as the Board found.

Nor can any such conclusion reasonably be drawn from Kalevo's Figure 4

conversion mappings. Accepting the Board's logic would mean that simple

conversion mappings such as the ones below "fairly suggest" the use of

mathematical functions—a plainly untenable conclusion.



Although each of the above examples depicts a series of variables connected

by an arrow to a desired conversion, and although each example *could be*

*represented* as a function—*e.g.*, $f_1 = \{(E, 2)\}$, $f_2 = \{(95, A)\}$, $f_3 = \{(795, \text{Super-}$ prime)}—it is evident that they neither constitute nor "fairly suggest" the use of any mathematical expressions. The Board's finding that Kalevo's Figure 4 "fairly suggests" *using* mathematical expressions simply because its conversion mappings "*can be represented*" mathematically thus lacks substantial evidence.

     ***Second,*** the Board's finding that the "relationships" in Figure are "mathematical" does not support the conclusion that Kalevo's Figure 4 teaches or suggests "*using* . . . mathematical expressions." As an initial matter, the claim limitations are not met by "mathematical relationships"; they require the ***use*** of mathematical ***expressions***, which Kalevo does not teach. And while Kalevo's Figure 4 mappings may "***correspond*** to surjective mapping," and surjective mapping may be a "***known concept*** in discrete mathematics," those premises do not support the conclusion that Kalevo's Figure 4 mappings ***use mathematical expressions***. That reality is again illustrated by the exemplary conversion mappings above (Last Names E-M→Compliance Group 2; Scores 90-10→Grade A; Credit 781-850→Rating Super-prime). In each instance, there is a surjective mapping of many possible variables to one output. And yet, neither those examples nor Kalevo's Figure 4 contain any teaching or suggestion regarding the ***use*** of any mathematical ***expressions***. Thus, the Board's decision to give "substantial weight" to Unified's expert testimony that the ***relationships*** shown in Figure are

41

"mathematical" does not provide substantial evidence to support its conclusion that Kalevo's Figure 4 teaches or fairly suggests the ***use*** of mathematical ***expressions***, as required by limitations 1.8 and 1.9.

Because the Board found limitations 1.8 and 1.9 satisfied based merely on evidence that Kalevo's Figure 4 mappings ***could be represented mathematically***, or else have ***mathematical relationships***, which do not meet the claim's requirement to "***use*** . . . mathematical expressions," the Board's findings lack substantial evidence and should be reversed. *Wireless Protocol Innovations, Inc. v. TCT Mobile, Inc.*, 771 F. App'x. 1012, 1016-18 (Fed. Cir. 2019); *Nidec Motor Corp. v. Zhonghan Broad Ocean Motor Co.*, 851 F.3d 1270, 1273-74 (Fed. Cir. 2017); *IBM v. Iancu*, 759 F. App'x. 1002, 1008-12 (Fed. Cir. 2019).

### III.    The Board abused its discretion by rejecting the proposed amended claims for lack of written description support

In addition to its defense of the original claims, Ideahub presented the Board with contingent amended claim 19 as a substitute for independent claim 1, and contingent amended claim 20 as a substitute for dependent claim 4. Appx31.

Relevant to this appeal, limitation 19.1 recited "determining an intra mode for a neighboring block of a current block," Appx30, which was identical to limitation 1.1 of issued claim 1. Appx6.

Unified opposed the contingent amended claims in part based on an alleged lack of written description support for limitation 19.1. Appx3017-3022.

After reviewing the proposed claims and the arguments, the Board issued a Preliminary Guidance, finding that limitation 19.1 has written description support in the '849 Patent and the underlying '240 Application. Appx3996-3997. In particular, the Board found that Equation 2 and the associated teachings of the '240 Application disclose determining the intra mode of a neighboring block. Appx3997 (finding that "the variable 'i' is referenced as . . . the intra mode of the neighboring block.").

In view of the Board's findings, Ideahub submitted a Revised Motion to Amend, addressing other aspects of the Board's Preliminary Guidance but leaving limitation 19.1 unchanged. Appx4040-4066. To further demonstrate written description support for limitation 19.1, Ideahub cited to the same portions of the '240 Application that the Board had relied upon in its Preliminary Guidance. Appx4047 (citing Appx2213:1-Appx2215:2). Ideahub additionally provided a further declaration from its expert, Dr. Clifford Reader, who explained that Equation 2 as disclosed in the '240 Application teaches "a cost function analysis to determine an intra mode for the current block" by using "an intra mode ($i$) **determined for the neighboring block**," *i.e.*, the "**directionality**" determined for

the neighboring block, which the '849 Patent uses "interchangeably" with "intra mode." Appx4072-4079 (emphasis added) (citing and quoting Appx2213:14-16).[1]

The Board's Final Written Decision nonetheless rejected the contingent amended claims for lack of written description as to limitation 19.1, contradicting its earlier Preliminary Guidance. While the Board agreed with Ideahub that the '240 Application teaches determining the ***directionality*** of neighboring blocks, Appx38 (citing Appx2213:2-3), it found that Equation 2 does not teach "determining ***an intra mode*** for a neighboring block." Appx40, Appx41.

The Board's reasoning proceeded based on the following findings:

(1)    the terms "directionality" and "intra mode" are not synonymous, Appx40-41;

(2)    directionality requires that intra prediction (i.e., reconstruction) ***has already occurred***, whereas intra mode is used ***during intra prediction***, Appx41-42;

(3)    the '240 Application teaches using the *directionality* of neighboring blocks to determine the intra mode of a current block, not using the *intra mode* of a neighboring block to do so, Appx42;

---

[1] Ideahub's Reply in support of the Revised Motion to Amend also explained that Unified's written description arguments rested on an incorrect interpretation of "determining," and if accepted would exclude the preferred embodiment of Equation 2 and the associated teachings. Appx4251-4253.

(4)    the variable $i$ as used in Equation 2 of the '240 Application does not refer to the intra mode of a neighboring block, but only refers to the intra mode that is to be determined for the current block undergoing decoding, Appx42;

(5)    therefore, the '240 Application does not provide written description support for the limitation "determining an intra mode for a neighboring block of a current block." Instead, it merely teaches determining a directionality for a neighboring block of a current block, which the Board deemed inadequate. Appx42, Appx50.

The Board further found that even if the variable $i$ in Equation 2 were understood to represent the intra mode of the neighboring block, that would still not provide written description support for limitation 19.1/1.1 because the '240 Application still would not teach a determination of a "single intra mode for the neighboring block," as the Board deemed the claims required. Appx45-50. That aspect of the Board's decision again rested on its finding that determining a directionality for a neighboring block does not satisfy determining an intra mode.

The Board's findings and its ultimate conclusion cannot be affirmed.

***First,*** the Board's finding that determining the ***directionality*** of a neighboring block does not meet "determining an ***intra mode*** for a neighboring block" is self-contradictory, and is also refuted by Unified's Petition.

45

With respect to limitation 1.1, which is identical to limitation 19.1, Unified's Petition exclusively and repeatedly argued that Kalevo teaches that limitation because Kalevo "determine[s] the *directionality*" of neighboring blocks, "which *corresponds* to determining *an intra mode* of the neighboring block." Appx101 (emphasis added). The Petition likewise stated that "in the context of the '849 Patent, a POSITA would have understood that determining an intra mode for a neighboring block *is satisfied by determining the directionality* of the neighboring block." Appx100 (citing Appx399-400). And the Petition further stated that "Kalevo describes the same determination of the directionality (*i.e., intra mode*) of neighboring blocks." Appx100.

The Petition thus expressly stated that (a) in the context of the '849 Patent, determining the *directionality* of a neighboring block discloses limitation 1.1 (and thus 19.1), and (b) Kalevo meets limitation 1.1 *because* it also discloses determining the *directionality* of a neighboring block, which the Petition stated "corresponds to" and is synonymous with "determining an intra mode for a neighboring block." Appx99-103.

The Board's Institution Decision acknowledged Unified's argument that "'determining an intra mode for a neighboring block' can mean determining the directionality of the neighboring block." Appx1349. The Board also recognized Unified's argument that "determining an intra mode for a neighboring block is

46

satisfied by determining the directionality of the neighboring block." Appx1350. And the Board *agreed* with Unified and instituted in part on that basis. Appx1351 ("we are persuaded by Petitioner's arguments" as to limitation 1.1).

The Board's Final Written Decision likewise found that Kalevo teaches limitation 1.1 *because* Kalevo allegedly teaches determining the ***directionality*** of a neighboring block. Appx29 ("we adopt Petitioner's contentions regarding limitation. [1.1] . . . as our own") (citing Appx99-103). The Board made no finding, and provided no discussion, that either Kalevo or any other prior art taught or suggested "determining an intra mode for a neighboring block" in any manner other than determining a ***directionality*** for a neighboring block.

The Board's finding that limitation 19.1 lacks written description support is thus directly and entirely contrary to its finding that Kalevo teaches or suggests limitation 1.1. Whereas the Board found limitation 1.1 met by the prior art because determining a directionality of a neighboring block *meets* "determining an intra mode for a neighboring block," Appx29, the Board conversely found that identical limitation 19.1 lacks written description support because determining a directionality of a neighboring block ***does not meet*** "determining an intra mode for a neighboring block." Appx40-42. The Board's final written decision did not even attempt to address that irreconcilable conflict.

The Board's decision is thus necessarily arbitrary and capricious both as to its finding of obviousness regarding the original claims and its finding of lack of written description for the contingent amended claims, and this Court should vacate and reverse the Board's decision in both respects. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); *Kan. City v. Dep't of Hous. & Urban Dev*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decision-making, and cannot survive review under the arbitrary and capricious standard."); *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) ("Because FERC's decision is internally inconsistent, it is arbitrary and capricious."); *IBG LLC v. Trading Techs. Int'l, Inc.*, 757 F. App'x 1004, 1008 (Fed. Cir. 2019) ("We conclude that the Board's reasoning with regard to the '132 and '304 patents is internally inconsistent and therefore arbitrary and capricious.").

At a minimum, the Board's directly contradictory rationales for its findings as to limitations 1.1 and 19.1 at least requires reversal of the Board's finding of

lack of written description support for the proposed amended claims and a remand for further proceedings as to those claims.

**Second**, the Board committed legal error by interpreting "determining an intra mode for a neighboring block" in a manner that excludes the preferred embodiment of Equation 2 and the associated teachings from the scope of the claims—an outcome that is "rarely, if ever, correct." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1320 (Fed. Cir. 2005) (quoting *Johns Hopkins Univ. v. CellPro*, 152 F.3d 1342, 1355 (Fed. Cir. 1998)); *Sling TV, L.L.C. v. Uniloc 2017 LLC*, No. 2021-1651, 2022 U.S. App. LEXIS 2957, at *7-8 (Fed. Cir. Feb. 2, 2022) ("Under the Board's interpretation of 'no data representing content,' the preferred RSS embodiment would fall outside the scope of claim 1 because standard RSS feeds contain metadata. . . . Because the Board's claim construction excludes a preferred embodiment and is inconsistent with the specification's description of the invention, it is incorrect."); *Uber Techs., Inc. v. X One, Inc.*, 799 F. App'x 868, 874 (Fed. Cir. 2020) ("In sum, the specification contemplates scenarios in which there are minutes or hours between the launch of Buddy Watch and the invocation of Mapit. In light of this disclosure, the Board's 'during or near' requirement must allow for method invocation minutes or hours after application launch. A contrary interpretation would exclude embodiments of the invention. A claim construction

49

that does not encompass a disclosed embodiment is rarely, if ever, correct.")

(internal citations and quotations omitted).

Indeed, the **title** of '849 Patent recites a "Video Decoding Method for

Performing Intra-Prediction ***Based on Directionality of Neighboring Block*.**"

Appx54 (emphasis added). The specification likewise teaches that "the intra-

prediction according to an example embodiment of the present invention selects

the intra mode of the current block on the basis of the ***directionality*** of the

neighboring blocks that have already been reconstructed." Appx69 (6:19-23)

(emphasis added). The specification reiterates the same exemplary embodiment

repeatedly. Appx70 (8:36-39, 8:48-51); Appx71 (10:39-41) ("In example

embodiments of the present invention, the ***directionality*** of the neighboring blocks

is used to select the intra mode suitable for the current block.") (emphasis added).

The Board's interpretation, which eliminates the ***titular*** and exemplary

embodiment of the invention from the scope of the claims, was legally erroneous.

*Wastow Enters., LLC v. Truckmovers. Com, Inc.*, 855 F. App'x 748, 751 (Fed. Cir.

2021) ("The patent's title—'Universal Folding Boom Trailer'—also indicates that

a relevant artisan would understand that the claims require a universal folding

boom trailer."); *Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824

F.3d 999, 1003 n. 2 (Fed. Cir. 2016) ("We have used the title of a patent to aid in

claim construction."); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553,

1557 (Fed. Cir. 1995); *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 823
(Fed. Cir. 2016); *Medrad*, 401 F.3d at 1320; *Sling TV*, No. 2021-1651, 2022 U.S.
App. LEXIS 2957, at *7-8; *Uber Techs.*, 799 F. App'x at 874.

Moreover, Ideahub presented the Board with evidence that during the
prosecution of a continuation of the '849 Patent, Ideahub overcame a § 112
rejection by stating that Equation 2 and its teachings regarding determining the
directionality of a neighboring block provide support for the limitation
"determining a first intra prediction mode associated with a neighboring block."
Appx4252-4253. The Board simply sought to ignore that evidence by stating, in a
footnote, that the rejection in the continuation application "involved indefiniteness
and not written description and is, therefore, unpersuasive." Appx45 n. 7. That
conclusory statement, however, fails to provide any reason why essentially
***identical*** claim language in two related patents should be interpreted in direct
conflict with the patentee's prosecution statements, and so as to exclude a preferred
embodiment that the patentee relied upon in support of that claim language.

The Board's refusal to consider Ideahub's evidence and argument that
excluding "determining a directionality" from the scope of "determining an intra
mode" would conflict with prosecution statements regarding an essentially
identical limitation in a continuation patent was arbitrary and capricious. *Aqua
Products v. Matal*, 872 F.3d 1290, 1325-26 (Fed. Cir. 2017) ("[A]n agency's

51

refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious within the meaning of 5 U.S.C. § 706, which governs review of agency adjudications.").

*Third,* even if this Court were to accept the Board's interpretation that determining a directionality for a neighboring block is not synonymous with determining an intra mode, substantial evidence still cannot support the Board's conclusion that limitation 19.1 lacks written description.

It is undisputed that "determining an intra mode for a neighboring block" as recited in limitations 1.1 and 19.1 was "***well-known***" in the art prior to the '849 Patent. Appx1341 (stating that Unified argued that limitation 1.1 was "well-known") (citing Appx93 (asserting that "the 'determining' steps" of claim 1, including limitation 1.1, "were well-known.")).

When a claim recites a limitation that is well-known in the art, the limitation satisfies the written description requirement, even if the specification contains no specific teaching about that limitation. *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014) ("a patent specification need not disclose or teach what is known in the art"); *Streck, Inc. v. Research & Diagnostic Sys.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (holding that "[i]t is well-established . . . that a specification need not disclose what is well-known in the art," and finding the written description requirement met "[g]iven the language in the patents-in-suit,

coupled with the well-known use of true reticulocytes in the prior art"); *Boston Sci.*

*Corp. v. Johnson & Johnson*, 647 F.3d 1354, 1366 (Fed. Cir. 2011) ("Because the

specification is viewed from the perspective of one of skill, in some circumstances,

the patentee may rely on information that is 'well-known in the art' for purposes of

meeting the written description requirement.").

By admitting and urging that the limitation "determining an intra mode for a

neighboring block" was "well-known," Appx93, Appx1341, Unified conceded that

the limitation meets the written description requirement. *Hill-Rom*, 755 F.3d at

1373; *Streck*, 665 F.3d at 1285; *Boston Sci.*, 647 F.3d at 1366. The Board's

contrary decision thus cannot be affirmed. *Aqua Prods. v. Matal*, 872 F.3d 1290,

1325 (Fed. Cir. 2017) ("an agency decision that fails to consider relevant

contradictory evidence is an arbitrary and capricious one").

Moreover, the Board's own findings, along with the testimony of Unified's

expert and the disclosures of the '240 Application, all confirm that "determining an

intra mode for a neighboring block" was well-known prior to the '849 Patent.

The Board found, and Unified conceded, that the '240 Application expressly

teaches using the directionality of neighboring blocks ***that have already been***

***reconstructed***. Appx41 (citing Appx4208 ¶ 68); Appx2213:1-5 (teaching

"selecting a mode suitable for a current block from among a plurality of intra

modes using directionality of neighboring blocks of the current block ***which have***

*already been reconstructed* in accordance with an example embodiment of the present invention.").

The Board further found, and Unified further conceded, that reconstructing the neighboring blocks first *requires determining the intra mode* for the neighboring blocks. Appx41 (quoting Appx4208 ¶ 68) (testifying that "the intra mode or number is a concept used during performance of intra prediction," and further stating that an "intra mode number [ ] was used in reconstructing" the neighboring blocks taught in the '240 Application).

The '240 Application expressly teaches that "the neighboring blocks . . . have already been reconstructed with respect to the current block *by the same method as H.264*." Appx2213:5-10 (emphasis added). Thus, the written description discloses that reconstruction of the neighboring blocks—which requires determining their intra mode—is performed using the method of H.264.

It is undisputed that the intra mode determination and reconstruction methods of H.264 were "well-known" to ordinary artisans at the time of the '849 patent. Appx67 (1:66-67) (referring to "the existing H.264 standard"); Appx4192 ¶ 36 ("A POSITA would have also recognized that, at the time of the '849 Patent's priority date, the H.264 standard was widely-adopted and used.").

Given the '240 Application's disclosure to perform reconstruction of neighboring blocks using the well-known method of H.264, which indisputably

requires determining the intra mode of the neighboring blocks, substantial evidence does not support the Board's conclusion that the '240 Application fails to provide written description support for "determining an intra mode for a neighboring block of a current block." *Hill-Rom*, 755 F.3d at 1373; *Streck*, 665 F.3d at 1285; *Boston Sci.*, 647 F.3d at 1366.

*Fourth,* the Board's decision should at least be set aside because the Board abruptly and unexpectedly changed its prior finding as to limitation 19.1 without providing Ideahub reasonable notice and an opportunity to respond, violating Ideahub's right to due process.

As this Court recently reiterated in *Baker Hughes Oilfield Operations, LLC v. Hirshfeld*, No. 2020-1932, 2021 U.S. App. LEXIS 27816, at *4-8 (Fed. Cir. Sep. 16, 2021), "[t]he APA prohibits the Board from changing theories midstream without giving reasonable notice of the change and an opportunity to present argument and evidence addressing the new theory." *Id.* (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015)). Thus in *Baker Hughes*, the Board's institution decision stated it would not rely on the petition's third ground, and explained that that ground was deficient. *Id.* But in its final written decision, the Board did rely on the petition's third ground to find unpatentability, without giving patent owner any notice of its shift in position or an opportunity to respond.

*Id.* This Court held the Board's conduct violated the Administrative Procedure Act, and vacated its decision on that basis. *Id.*

Here, the Board's Institution Decision accepted Unified's assertion that "'determining an intra mode for a neighboring block' can mean determining the directionality of the neighboring block." Appx1349; Appx1351 ("we are persuaded by Petitioner's arguments" as to limitation 1.1). The Board also accepted Unified's argument that "determining an intra mode for a neighboring block is satisfied by determining the directionality of the neighboring block." Appx1350-1351.

The Board's Preliminary Guidance likewise found that the '240 Application's teachings as to determining the directionality of a neighboring block provide written description support for limitation 19.1's requirement of "determining an intra mode for a neighboring block." Appx3996-3997.

Ideahub thus had no notice or expectation that the Board would conclude that determining a directionality is not synonymous with determining an intra mode, and had no opportunity to react to any such position from the Board.

As a result, Ideahub did not contest Unified's obviousness theory as to limitation 1.1 after institution, despite the fact that Unified's theory rests ***entirely*** on the assertion that determining a ***directionality*** for a neighboring block meets "determining an intra mode." Pet. at 17-20.

The Board's failure to give Ideahub reasonable notice of its changing position also deprived Ideahub of the opportunity to obviate the Board's views through its revised amended claims. In particular, Ideahub could have simply revised limitation 19.1 to recite "determining a *directionality* of a neighboring block of a current block," which is indisputably disclosed in the '240 Application. *See* Appx41. Moreover, Ideahub could have demonstrated before the Board the multiple levels of errors underlying the Board's finding, as it has done here.

Because the Board entirely and unexpectedly changed its position without providing Ideahub reasonable notice and an opportunity to respond, to Ideahub's prejudice, the Board's finding that limitation 19.1 lacks written description support should at a minimum be vacated and remanded. *Baker Hughes*, No. 2020-1932, 2021 U.S. App. LEXIS 27816, at *4-8; *Belden*, 805 F.3d at 1080.

## CONCLUSION

For the reasons above, the Court should reverse the Board's conclusion of obviousness as to all challenged claims of the '849 patent and the Board's finding that the proposed amended claims lack written description support. At a minimum, this Court should vacate the Board's finding that the amended claims lack written description support.

Respectfully submitted,

*/s/ Kayvan B. Noroozi*
Kayvan B. Noroozi

57

NOROOZI PC
11601 Wilshire Blvd., Ste. 2170
Los Angeles, CA 90025
Telephone: (310) 975-7074
Facsimile: (844) 975-7074

*Counsel for Appellant*

# **ADDENDUM**

*Final Written Decision on Remand in IPR20202-00702—Appx0001*

*US Patent No. 9,641,849—Appx0054*

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

UNIFIED PATENTS, LLC,
Petitioner,

v.

IDEAHUB INC.,
Patent Owner.

IPR2020-00702
Patent 9,641,849 B2

Before BRYAN F. MOORE, KEVIN W. CHERRY, and
MONICA S. ULLAGADDI, *Administrative Patent Judges*.

CHERRY, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Denying Patent Owner's Revised Contingent Motion to Amend
*35 U.S.C. § 318(a)*

I. INTRODUCTION

A. BACKGROUND

Unified Patents, LLC ("Petitioner") filed a petition (Paper 2, "Pet.") to institute an *inter partes* review of claims 1 and 4 of U.S. Patent No. 9,641,849 B2 (Ex. 1001, "the '849 patent"). *See* 35 U.S.C. § 311. Ideahub

Inc. ("Patent Owner") timely filed a Preliminary Response.  Paper 6
("Prelim. Resp.").  Pursuant to our authorization, Petitioner filed a
Preliminary Reply ("Prelim. Reply," Paper 7), and Patent Owner filed a
Preliminary Sur-Reply ("Prelim. Sur-Reply," Paper 8).

On September 17, 2020, based on the record before us at the time, we
instituted an *inter partes* review of all challenged claims on the sole ground
alleged.  Paper 9 ("Institution Decision" or "Dec.").  The sole ground we
instituted trial on is reproduced below:

| Claim(s) challenged | 35 U.S.C. § | Reference(s) |
| --- | --- | --- |
| 1, 4 | 103(a)[1] | Kalevo[2] and Song[3] |

Petitioner supports its Petition with a Declaration by Dr. Immanuel
Freedman, dated March 12, 2020.  Ex. 1003.

Patent Owner filed a Response in opposition to the Petition (Paper 17,
"PO Resp.").  Patent Owner supported its Patent Owner Response with the
Declaration of Cliff Reader, Ph.D. (Ex. 2001).  Patent Owner also filed a
contingent Motion to Amend.  Paper 18.  Petitioner filed a Reply in support
of the Petition (Paper 25, "Pet. Reply").  Petitioner supports the Reply with
the Second Declaration of Dr. Immanuel Freedman (Ex. 1021).  Petitioner

[1] Because the claims at issue appear to have an effective filing date prior to
March 16, 2013, the effective date of the applicable provisions of the Leahy-
Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011)
("AIA"), we apply the pre-AIA versions of 35 U.S.C. §§ 102 and 103 in this
Decision.
[2] U.S. Patent Application Publication US 2001/0017942 A1, published
August 30, 2001(Ex. 1004).

[3] U.S. Patent Application Publication US 2009/0225834 A1, published
September 10, 2009 (Ex. 1005).

filed an Opposition to the Motion to Amend.  Paper 24.  Patent Owner filed a Sur-reply responding to the Reply (Paper 30, "PO Sur-Reply").

On April 8, 2021, we filed Preliminary Guidance on Patent Owner's Motion to Amend.  Paper 29 ("Preliminary Guidance" or "Prelim. Guide."). Patent Owner then filed a Revised Contingent Motion to Amend (Paper 31, "Rev. Mot. Amend") proposing to substitute claim 19 ("proposed substitute claim") for claim 1.  Patent Owner supports its Revised Contingent Motion to Amend with a Second Declaration of Dr. Clifford Reader (Ex. 2017). Petitioner filed an Opposition to Patent Owner's Revised Contingent Motion to Amend (Paper 37, "Opp.").  Petitioner supports its Opposition with the Third Declaration of Dr. Immanuel Freedman in Support of Petitioner's Opposition, dated June 3, 2021 (Ex. 1035).  Patent Owner filed a Reply in Support of its Contingent Motion to Amend (Paper 39, "PO Reply").  Patent Owner supports its Reply in support of its Revised Contingent Motion to Amend with a Third Declaration of Dr. Clifford Reader (Ex. 2021). Petitioner also filed a Sur-Reply in Opposition to Patent Owner's Revised Contingent Motion to Amend (Paper 43, "Pet. Sur-Reply").

Both parties requested an oral hearing.  *See* Paper 42.  A public and transcript and a confidential transcript of the oral hearing are entered in the record.  Paper 50 ("Public Tr."); 51 ("Confidential Tr.").

We have jurisdiction under 35 U.S.C. § 6.  The evidentiary standard is a preponderance of the evidence.  *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons expressed below, we conclude that Petitioner has demonstrated by a preponderance of evidence that claims 1 and 4 are unpatentable. We *deny* Patent Owner's Revised Motion to Amend.

B. RELATED PROCEEDINGS

The parties do not disclose any related litigation, but assert that the following U.S. patents and pending patent applications claim priority benefit of the '849 patent: U.S. Patent Application 16/407,086; U.S. Patent Application 16/407,095; U.S. Patent No. 10,623,749; U.S. Patent No. 10,623,750; U.S. Patent No. 10,623,751. Pet. 1; Paper 4, 1.

C. THE '849 PATENT

The '849 Patent, entitled "Video Encoding Apparatus, Video Decoding Apparatus, And Video Decoding Method For Performing Intra-Prediction Based On Directionality Of Neighboring Block," relates to "improving compression efficiency in directional intra-prediction." Ex. 1001, [54], [57], 1:23–24. According to the '849 patent:

> [a] fundamental principle of compressing data is based on a process of eliminating the redundancy from data. The data can be compressed by eliminating spatial redundancy referring to repetition of the same color or object in an image, temporal redundancy referring to little or nothing of variation between neighboring frames in a moving picture frame or successive repetition of same sound in the audio, or psycho-visual redundancy referring to dullness of human vision and sensation to high frequencies.

*Id.* at 1:37–45.

The '849 patent explains that "H.264" is a known compression standard that uses "directional intra-prediction" [which the '849 patent shortens simply to "intra-prediction"] to eliminate spatial redundancy within a frame. Ex. 1001, 1:50–53. "[I]ntra-prediction refers to a method of

cop[y]ing one sub-block in a designated direction using neighboring pixels in upward and leftward directions, predicting values of current sub-blocks, and encoding only the differences between the copied values and the predicted value of the sub-blocks." *Id.* at 1:54–58. When compressing video including pixels of a monochromatic sky, for example, the "pixels that are close to one another within a video frame are likely to have similar characteristics," and thus the values of adjacent pixels can be predicted. Pet. 5. Intra-prediction thereby "reduce[s] the amount of data necessary for transmission and reconstruction" of an image. *Id.* at 5–6.

The '849 patent discloses that in the "intra-prediction technique complying with the existing H.264 standard, a prediction block is generated from a current block on the basis of another block having a previous encoding sequence." Ex. 1001, 1:66–2:3. "Nine prediction modes can be selected for each 4x4 block," namely, "eight modes having directionality" and one "DC mode." *Id.* at 3:8–10. A "video encoder based on H.264 selects one from among the prediction modes with respect to each block." *Id.* at 2:7–11.

According to the '849 patent, the intra mode information needed in H.264 standard compression "may act as [] overhead increasing the size of a coded bitstream." *Id.* at 3:19–27. Accordingly, the '849 patent proposes "a video encoding [and] decoding method and apparatus" in which the "video encoding apparatus . . . does not need to record intra-mode information" and the "video decoding apparatus . . . does not need to receive intra mode information." *Id.* at 3:35–62. The '849 patent discloses that the embodiments disclosed therein will "enhanc[e] efficiency of intra-prediction in video coding." *Id.* at 3:25–28. In one embodiment, for example, when a

compressed image is decoded, the decoder "reconstruct[s] a residual signal of a current block from an input bitstream; select[s] one from among a plurality of intra modes; and perform[s] an intra-prediction according to a directionality of the selected intra mode to reconstruct the current block." *Id.* at 3:64–4:1.

Claim 1 is the sole independent claim among the challenged claims. Claim 4 depends from claim 1. Independent claim 1, which is illustrative, recites (with bracketing added):

> 1. A video decoding method performed by a video decoding apparatus, the method comprising:
>
> [1.1] determining an intra mode for a neighboring block of a current block;
>
> [1.2] determining an intra mode for the current block based on whether the intra mode for the neighboring block is a directional mode or a non-directional mode;
>
> [1.3] performing intra-prediction according to the intra mode for the current block to generate a prediction block for the current block;
>
> [1.4] obtaining quantization coefficients from an input bitstream;
>
> [1.5] dequantizing the quantization coefficients to generate transform coefficients;
>
> [1.6] transforming the transform coefficients to a residual block for the current block; and
>
> [1.7] adding the prediction block and the residual block to reconstruct the current block,
>
> [1.8] wherein the intra mode for the current block is determined by using a first set of one or more mathematical expressions, if the intra mode for the neighboring block is the non-directional mode,
>
> [1.9] wherein the intra mode for the current block is determined by using a second set of one or more mathematical

expressions, if the intra mode for the neighboring block is the directional mode, and

[1.10] wherein the second set of one or more mathematical expressions is different from the first set of one or more mathematical expressions.

*Id.* at 11:41–12:3.

## II. ANALYSIS

### A. REAL PARTIES IN INTEREST

Patent Owner contends that the Petition fails to name all real parties in interest ("RPIs") as required by 35 U.S.C. § 312(a)(2).  PO Resp. 33–52. Section 312(a)(2) requires that the "petition identif[y] all real parties in interest."  This provision serves important notice functions to patent owners, to identify whether the petitioner is barred from bringing an IPR due to an RPI that is time-barred or otherwise estopped, and to the Board, to identify conflicts of interests that are not readily apparent from the identity of the petitioner.  *See NOF Corp. v. Nektar Therapeutics*, IPR2019-01397, Paper 24 at 6 (PTAB Feb. 10, 2020) (citing Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012); CTPG 12 (Nov. 2019). Accordingly, petitioners must comply with these requirements in good faith. *See* 37 C.F.R. §42.11(a) (duty of good faith and candor in proceedings). Whether a non-party is a RPI is a "highly fact-dependent question" and must be considered on a case-by-case basis.  *Ventex Co. v. Columbia Sportswear N. Am., Inc.*, IPR2017-00651, Paper 148 at 6 (PTAB Jan. 24, 2019) (precedential) (citing Office Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012)).

Petitioner identifies Unified Patents, Inc. ("Unified") as the sole RPI in this proceeding.  Pet. 1.  Patent Owner, relying on the Federal Circuit's

decision in *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1351 (Fed. Cir. 2018) ("*AIT*"), and the Board's decision on remand from *AIT*, *RPX Corp. v. Applications in Internet Time, LLC*, IPR2015-01750, Paper 128 at 9 (Oct. 2, 2020) (designated precedential Dec. 4, 2020) ("*AIT Remand*"), contends that Petitioner also should have named two members of Unified ("Unnamed RPIs") as RPIs.  PO Resp. 34–35.  Patent Owner contends that because the Unnamed RPIs were paying members of Unified during the present proceeding, and remain members, the Unnamed RPIs have a preexisting, established relationship with Unified.  *Id.* at 35–41. Patent Owner more particularly contends that "which [the Unnamed RPIs— as Unified's clients—have an interest in and will benefit from Unified's actions, and whether Unified 'can be said to be representing that interest' based on its relationship with [the Unnamed RPIs] . . . that Unified files its IPRs in the Video Codec Zone, including the instant one, to benefit its unlicensed members. . . ."  *Id.* at 42.

On this record, we determine that we need not address whether the Unnamed RPIs were improperly excluded because, "even if [they] were, it would not create a time bar or estoppel under 35 U.S.C. § 315."  *SharkNinja Operating LLC v. iRobot Corp.*, IPR2020-00734, Paper 11 at 32 (Oct. 6, 2020) (precedential) ("*SharkNinja*").  Like in *SharkNinja*, the Unnamed RPIs here are currently members of Unified.  Unlike in *SharkNinja*, however, neither Petitioner nor any of the Unnamed RPIs were sued.  Pet. Reply 18 (asserting that "[n]o Unified member is an RPI, especially because . . . to the best of Unified's knowledge, none has been sued or threatened with suit by Ideahub," and that thus, "there are no . . . time-bar issues").  Petitioner also asserts that none of the Unnamed RPIs have

challenged the '849 patent. *Id.* (asserting that "[n]o Unified member is an RPI, especially because . . . no Unified member has filed its own patent challenge to the '849 patent" and that thus, "there are no estoppel . . . issues"). Accordingly, we determine that neither issues of time bar nor issues of estoppel are implicated.

Under the Board's precedential decision in *Lumentum Holdings, Inc. v. Capella Photonics, Inc.*, the Board's jurisdiction to consider a petition does not require a "correct" identification of all RPIs in a petition. IPR2015-00739, Paper 38 at 6 (PTAB Mar. 4, 2016) (precedential); *see also Blue Coat Sys., Inc. v. Finjan, Inc.*, IPR2016-01444, Paper 11 at 10 (PTAB July 18, 2017) ("Evidence [of failure to identify all RPIs] is, at best, suggestive of an issue that is not jurisdictional."). The Federal Circuit has held that § 312(a)(2) is not jurisdictional. *See Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1240 (Fed. Cir. 2019) ("[I]f a petition fails to identify all real parties in interest under § 312(a)(2), the Director can, and does, allow the petitioner to add a real party in interest.") (quoting *Wi-Fi One, LLC v. Broadcom Corp.*, 878 F.3d 1364, 1374 n.9 (Fed. Cir. 2018) (en banc)).

In the present proceeding, there is no allegation that Petitioner's exclusion of the Unnamed RPIs should result in termination of the proceeding or denial of institution of review for any reason other than for the alleged failure of a procedural requirement that can be corrected pursuant to Board precedent. Additionally, there is no allegation or evidence that any of the Unnamed RPIs is barred or estopped from this proceeding, or that Petitioner purposefully omitted any of the Unnamed RPIs to gain some advantage.

B. Claim Interpretation

We interpret claims in the same manner used in a civil action under 35 U.S.C. § 282(b), "including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019).[4]  When applying that standard, we interpret the claim language as it would be understood by one of ordinary skill in the art in light of the specification.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010).  Thus, we give claim terms their ordinary and customary meaning as they would be understood by an ordinarily skilled artisan.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning 'is the meaning that the term would have to a person of ordinary skill in the art in question.'" (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005))).  Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

In our Institution Decision, we agreed with both parties that no construction of any term was for our determination of whether to institute *inter partes* review.  Dec. 7.

[4] On October 11, 2018, the USPTO revised its rules to harmonize the Board's claim construction standard with that used in federal district court. Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (now codified at 37 C.F.R. § 42.100(b) (2019)).  This rule change applies to petitions filed on or after November 13, 2018.  *Id.*

After our Institution Decision, Patent Owner raised two claim construction issues in its Patent Owner Response: (1) "wherein the intra mode for the current block is determined by using a [first/second] set of one or more mathematical expressions, if the intra mode for the neighboring block is the [nondirectional/directional] mode" and (2) "wherein the second set of one or more mathematical expressions is different from the first set of one or more mathematical expressions."  PO Resp. 10–18.

We determine that no construction of these terms is necessary for this Final Written Decision.

### 1. Other Claim Terms

We discern no other terms in need of express interpretation. Accordingly, we apply the legal standards set forth above when reading the claims.

## C. THE PARTIES' POST-INSTITUTION ARGUMENTS

In our Institution Decision, we concluded that the argument and evidence adduced by Petitioner demonstrated a reasonable likelihood that claims 1 and 4 were unpatentable.  Dec. 24.  We must now determine whether Petitioner has established by a preponderance of the evidence that the remaining challenged claims are unpatentable over the cited prior art. 35 U.S.C. § 316(e) (2018).  We previously instructed Patent Owner that "any arguments not raised in the [Patent Owner Response] may be deemed waived."  Paper 10, 8; *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1381 (Fed. Cir. 2016) (holding that patent owner's failure to proffer argument at trial as instructed in scheduling order constitutes waiver).  Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should

identify all the involved claims that are believed to be patentable and state the basis for that belief." Consolidated TPG at 66.

D. LEGAL STANDARDS

Petitioner challenges the patentability of claims 1 and 4 on the ground that the claims are unpatentable as obvious over Kalevo and Song. To prevail in its challenge to the patentability of the claims, Petitioner must establish unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d) (2019). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burdens of proof in *inter partes* review).

The Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), reaffirmed the framework for determining obviousness as set forth in *Graham v. John Deere Co.*, 383 U.S. 1 (1966). The *KSR* Court summarized the four factual inquiries set forth in *Graham* that we apply in determining whether a claim is unpatentable as obvious under 35 U.S.C. § 103(a) as follows: (1) determining the scope and content of the prior art, (2) ascertaining the differences between the prior art and the claims at issue, (3) resolving the level of ordinary skill in the pertinent art, and (4) when in evidence, considering objective evidence indicating obviousness or

nonobviousness. *KSR*, 550 U.S. at 406 (citing *Graham*, 383 U.S. at 17–18). In an *inter partes* review, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

Petitioner must explain how the proposed combinations of prior art would have rendered the challenged claims unpatentable. An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *accord Translogic*, 504 F.3d at 1259. Petitioner also must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *NuVasive*, 842 F.3d at 1382.

At this final stage of the proceeding, we determine whether a preponderance of the evidence of record shows that the remaining challenged claims would have been rendered obvious in view of the asserted prior art. We analyze the asserted ground of unpatentability in accordance with these principles.

E. LEVEL OF ORDINARY SKILL

We review the grounds of unpatentability in view of the understanding of a person of ordinary skill in the art at the time of the invention. *Graham*, 383 U.S. at 17. Petitioner proposes that a person of ordinary skill

> A person of ordinary skill in the art at the priority date for the '849 Patent ("POSITA") would have had a bachelor's degree in electrical or computer engineering, or a closely related scientific field such as physics or computer science, and two years of work experience with video processing. A lack of experience can be remedied with additional education (e.g., a Master's degree), and

likewise, a lack of education can be remedied with additional
work experience (e.g., 4–5 years).

Pet. 10–11 (citing Ex. 1003 ¶ 48). Patent Owner does not dispute this

definition of a person of ordinary skill. *See generally* PO Resp. Patent

Owner's expert, Dr. Reader, however, testifies that

> It is my opinion that one of ordinary skill in the art in the field of
> video compression in the 2009 time period, would have had a
> bachelor's degree in electrical engineering or computer science,
> or an equivalent degree, and two to three years of experience in
> the field of video compression.

Ex. 2001 ¶ 45.

We see no meaningful distinction between these definitions relevant

to the particular issues necessary to decide this case. We adopt Petitioner's

proposed level of ordinary skill, as it appears to be consistent with the level

of skill reflected by the Specification and in the asserted prior art references.

*See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior

art itself can reflect the appropriate level of ordinary skill in the art).

F. CLAIMS 1, 4:
   OBVIOUSNESS BASED ON KALEVO AND SONG

Petitioner argues that the combination of Kalevo and Song renders

claims 1 and 4 unpatentable as obvious. Pet. 16–60. Claim 1 is independent

and claim 4 depends from claim 1. Ex. 1001, 11:41–12:3, 12:11–19. Patent

Owner argues that Petitioner's challenge to claims 1 and 4 fails. *See* PO

Resp. 18–32; PO Sur-Reply 4–10

   *1. Independent Claim 1*

We first consider Petitioner's argument that the combination of

Kalevo and Song renders obvious claim 1. Pet. 16–57.

a. Kalevo

Kalevo is a U.S. Patent Application Publication titled "Method For Encoding Images, And An Image Coder." Ex. 1004, [54]. Kalevo discloses a method in which "spatial prediction for a block . . . is performed to reduce the amount of information to be transmitted." *Id*. at [57]. In Kalevo's prediction method, "a classification is determined for at least one neighbouring[5] block (L, U) of said block (C) to be predicted according to the contents of said neighbouring block (L, U), and a prediction method (P1-P13) is selected for the current block (C) on the basis of at least one said classification." *Id.* Kalevo also explains that its invention is "based on the idea that to perform spatial prediction of pixel values for a block to be coded, adjacent decoded blocks are examined to determine if there exists some directionality in the contents of the adjacent blocks." *Id.* ¶ 23.

Kalevo discloses that an object of the invention is to "improve *encoding and decoding* of digital images such that higher encoding efficiency can be achieved and the bit rate of the encoded digital image can be further reduced." *Id.* ¶¶ 14 (emphasis added), 19–20. Figure 3a of Kalevo illustrates an embodiment and is reproduced below.



Fig. 3a

---

[5] When quoting Kalevo, we use the British spelling "neighbouring" as it appears in Kalevo, notwithstanding the '849 patent's spelling, "neighboring."

Figure 3a shows "blocks that are used for prediction," according to an embodiment of the invention. *Id.* ¶ 29. Kalevo discloses determining a prediction method for the current block (C) based on one or more of the left neighboring block (L) (first neighboring block) and the upper neighboring block (U) (second neighboring block). *Id*. ¶ 38.

b. Song

Song is a U.S. Patent Application Publication titled "Method And Apparatus For Image Intra Prediction." Ex. 1005, [54]. Song discloses a method "for intra prediction of an image" which includes "calculating arbitrary edge directions and amplitudes of the edges based on the neighboring pixels of a prediction block," and "determining an intra prediction mode" using that information. *Id*. at [57], ¶ 11. In one embodiment, Song describes a "moving picture *decoding* apparatus" that includes an "entropy *decoder* 910, a rearrangement unit 920, an inverse quantization unit 930, an inverse transform unit 940, a motion compensation unit 950, an intra prediction unit 960, and a filter 970." *Id.* ¶ 108 (emphases added). The "decoder" is used to "extract intra prediction mode information and quantized coefficient information." *Id.* ¶ 109.

c. Analysis

Petitioner argues that the preamble and the limitations "[1.3] performing intra-prediction," "[1.4] obtaining quantization coefficients," "[1.5] dequantizing the quantization coefficients," "[1.6] transforming the transform coefficients," and "[1.7] adding the prediction block" all recite standard, well-known aspects of video compression, such as aspects of the H.264 standard referenced in the '849 patent itself. Pet. 9–10, 26–38; Ex. 1003 ¶ 44. The Petition maps the alleged teachings of Kalevo and Song

to the foregoing limitations, in detail.  Pet. 26–38.  Regarding the remaining limitations, i.e., "[1.1] determining and intra mode for a neighboring block," "[1.2] determining an intra mode for the current block," and the "wherein" clauses [1.8], [1.9], and [1.10], Petitioner argues that these steps were also well-known and taught or suggested in the cited prior art, particularly Kalevo.  Pet. 10.

For example, as to the "determining" steps in elements [1.1] and [1.2], Petitioner argues that Kalevo teaches using the intra mode of neighboring, previously decoded blocks to accurately determine the intra mode of a current block to be decoded.  Pet. 16–25.  Specifically, Petitioner alleges that Kalevo discloses "reduc[ing] redundant information in image data" that can be used for "intra-frame coding in block-based video coders," and describes that "spatial prediction for a block (C) is performed" based on "a classification . . . determined for at least one neighbouring block . . . of said block (C) to be predicted."  Ex. 1004 ¶¶ 12–13, [57].  According to Petitioner, Kalevo uses the "directionality information" of neighboring blocks for classification and spatial prediction.  *Id*. ¶ 23.

In sum, Petitioner argues that Kalevo teaches all of "the techniques alleged by the '849 patent to be novel, while Song . . . fills in well-known details and structure of a decoder" for performing the steps that the '849 patent acknowledges are standard.  Pet. 10; Ex. 1001, 6:61–65.  Relying on the testimony of Dr. Freedman and the disclosures in Kalevo, Petitioner argues a person of ordinary skill would have combined the "prediction methods of Kalevo with the decoding details of Song" according to "known methods" to yield "predictable results."  Pet. 28–33.

Patent Owner characterizes the Petition as providing two theories to account for limitations [1.8]–[1.10]:  (1) Kalevo's decoder uses mathematical expressions included in each prediction method to evaluate the prediction methods and select an applicable one for a current block (step 23 in FIG. 2); and (2) Kalevo uses mathematical expressions to classify the directionality of the neighboring blocks (step 22 in FIG. 2), which is in turn used to determine the intra mode for the current block.  PO Resp. 26; PO Sur-Reply 4.  With respect to the first theory, Patent Owner explained that, building on its arguments regarding the preamble discussed below, that only Kalevo's encoder, not its decoder, perform Kalevo's prediction method.  PO Resp. 26–29.  With respect to the second theory, Patent Owner acknowledges this method—the directional classification process—is performed by both the encoder and decoder, but Patent Owner argues that the directional classification process does not choose between sets of mathematical expressions according to the determined intra mode for the neighboring block.  *Id.* at 29.  Instead, Patent Owner contends that this process is performed in order to determine the neighboring block's directionality—not the current block's directionality as required by the claim.  *Id.*

In its Reply, Petitioner argued that there was a third theory disclosed—that Kalevo's mapping of directionality classes to context classes accounted for these limitations.  Pet. Reply 8–9.  Specifically, Petitioner notes that the Petition argued that Kalevo's "mapping from the directional and non-directional classes D0 through D10 to context classes C0 through C6 corresponds to a mathematical operation of many-to-one mapping of discrete mathematics . . . ." *Id.* at 9 (quoting Pet. 48–49).  And thus, the "set

of prediction methods (rules) available for each combination of classes of L block and U block is determined by using one or more mathematical expressions." *Id.*

Petitioner contends that Kalevo's decoder performs these operations after the neighboring blocks' directionality is identified (i.e., these operations are performed to determine the current *block's* intra mode, based on the neighboring block, corresponding to the non-directional method's limitations [1.2] and [1.8]). *Id.* (citing Ex. 1021 ¶¶ 25–54). Petitioner asserts that the context class mapping corresponds to Figure 2's step 20 (see Ex. 1004 ¶ 41), and the prediction method lookup corresponds to step 22 (*see id.* at Fig. 2). *Id.* Petitioner reproduces a version of Figure 2 of Kalevo, as annotated by Patent Owner to demonstrate that there is no dispute that the steps of this third theory are performed entirely by the decoder. *Id.* at 9–10.



Figure 2 of Kalevo (annotated)

Figure 2 of Kalevo as annotated by Patent Owner is a block diagram of the method of Kalevo with red box showing the steps performed by the encoder and decoder and a blue box showing the steps performed by only the encoder.  PO Resp. 27.  Steps 20 and 22 are within the red box.  *Id.* According to Kalevo, Figure 2 illustrates performing context-dependent selection 17 of a subset of prediction methods by classifying neighboring blocks, and performing construction 18 of a prediction block using the selected prediction method.  Ex. 1004 ¶ 35, Fig. 2.  Kalevo discloses that directionality classifier 19 analyzes the directionality of neighboring blocks using pixel value gradients, and each neighboring block is mapped 20 into either one of eight directional classes D0–D7 or one of three non-directional classes D8–D10.  *Id.* ¶ 41.

Petitioner further explains that "if a neighboring block (e.g., neighboring block U) is 'classified as non-directional class D8' as the Petition discussed (at 48), Kalevo's decoder maps that non-directional class D8 onto context class C5."  Pet. Reply 10.  This is shown in Figure 4 of Kalevo.  Further, as shown in Figure 4 of Kalevo, reproduced below, each directionality class is further mapped to one of six context classes C1–C6. Ex. 1004 ¶¶ 73–74.



# Fig. 4

Figure 4 is a block diagram illustrating the "mapping of directionality classes to context classes." *Id.* ¶ 30.

Petitioner focuses on an excerpt of Figure 4, which was reproduced in excerpted form on page 21 of the Petition.



*Kalevo* (EX1004), Figure 4 (excerpt)

An excerpt of Figure 4 of Kalevo showing the mapping of non-directional class D8 onto context class C5. Pet. Reply 11. Petitioner argues that this mapping shown in Figure 4 is a mathematical expression and can be written as an equation. *Id.* at 11–12 (citing Ex. 1003 ¶ 138; Ex. 1021 ¶¶ 44–53; Ex. 1013).

Petitioner submits that "[t]his mathematical operation is used to determine the current block's intra mode, because these mappings are performed in Kalevo's step 20, which is a prerequisite to the prediction method subset selection (step 22)." *Id.* at 12 (citing Ex. 1021 ¶¶ 54, 55). Petitioner explains this accounts for limitation [1.8] where the first set of equations includes the mathematical expression that expresses a surjective mapping from the neighboring block's non-directional class D8 to context class C5, which is used by the decoder to select a prediction method subset (step 22). *Id.* Petitioner submits that the decoder uses the subset, along with

the "rank" from the encoder to "determine the correct prediction method." *Id.* (citing Ex. 1004 ¶¶ 148–149; Pet. 38–49).

For limitation [1.9], Petitioner argues that the Petition cited the example in which neighboring "block U is classified as context class C4 (mapped from any one of directional classes D5, D6, or D7)." *Id.* at 13 (citing Pet. 52). Petitioner submits that this mapping is represented by a many-to-one mathematical expression depicted in Kalevo's Figure 4. An excerpt of Figure 4 of Kalevo is reproduced below.



*Kalevo* (EX1004), Figure 4 (excerpt)

An excerpt of Figure 4 of Kalevo is reproduced above showing the mapping of Directional classes D5, D6, and D7 onto Context class C5. Pet. Reply 14; Pet. 22. Petitioner contends that, as described with regards to limitation [1.8], that these mappings are mathematical expressions. *Id.*

Finally, Petitioner notes that "this mathematical expression (the mappings from D5-D7 to C4, which correspond to the second set) is different than the first set (the mappings from D8-D10 to C5-C6, which correspond to the first set), consistent with limitation [1.10]." Pet. Reply 15.

Petitioner further notes these sets are not subsets of each other, consistent with Patent Owner's construction. *Id.* (citing Ex. 1021 ¶¶ 54, 60, 64–66).

Patent Owner's primary argument against the class mapping or "third" theory is that it is untimely. PO Sur-Reply 6–8. Patent Owner raises three points why it contends that the argument was not sufficiently raised previously. First, Patent Owner asserts that the Petitioner's argument was only raised with respect limitation [1.8] and "[n]o reference to this directionality-to-context mapping was made in the Petition's analysis of elements [1.9]-[1.10]." *Id.* at 6–7. Patent Owner argues that "Petitioner never alleged 'with particularity' that Kalevo's class mapping corresponds to the claimed ***different*** first ***and second*** sets of mathematical expressions." *Id.* at 7. Second, Patent Owner argues that "the one-off statement fairly conveys one mathematical operation representing all directionality classifications." *Id.* Third, Patent Owner contends that "the Petition provided no analysis as to how the mapping constitutes a mathematical expression that is used in the process of determining the current block's intra mode." *Id.*

We do not agree with Patent Owner that Petitioner's so-called "third" theory is untimely and should be disregarded. To begin with, there is no dispute that the theory is, at least, raised with respect to claim limitation [1.8]. *See* PO Sur-Reply 6. Patent Owner disputes the particularity of this contention, but we find that it is sufficiently clear. The theory is not complicated and the sentence, especially given the detailed explanation of the other theories and of how Kalevo works, is sufficient to provide notice. Moreover, the cited paragraph of Dr. Freedman's First Declaration

(Paragraph 140) provides additional detail to clarify the theory.  Ex. 1003
¶ 140.

Petitioner's reply does explain how this third theory fits into Patent
Owner's arguments and claim constructions, but Petitioner's Reply does not
expand the theory beyond the contours provided in the Petition.  As for
limitations [1.9] and [1.10], we also find that the third theory was disclosed.
To begin with the cited sentence in limitation [1.8] and supporting paragraph
from Dr. Freedman's declaration discusses the mapping of both directional
and non-directional modes to classes, thus including both limitations [1.8]
and [1.9].  As Petitioner points out, the Petition's analysis of limitation [1.9]
repeatedly refers back the analysis for limitation [1.8] and explicitly
describes on page 52 of the Petition that

> Additionally, as a further teaching of this limitation, for the
> above case in which block L is classified as context class C3
> (mapped to from directional class D4) and block U is classified
> as context class C4 (mapped from any one of directional classes
> D5, D6, or D7), the determination of each neighboring block's
> classification, and thus, the determination of the intra prediction
> mode for the neighboring block, is based on a second set of one
> or more mathematical expressions.

Pet. 52.  Finally, with respect limitation [1.10], we note that, although it is
less clear, the analysis of limitation [1.10] does explain how classes C1–C6
are not the same in that they involve different underlying rules.  *Id.* at 55–57.
Finally, Patent Owner's arguments that "the Petition provided no analysis as
to how the mapping constitutes a mathematical expression that is used in the
process of determining the current block's intra mode" is belied by the
Petition's detailed explanation of how Kalevo operates.  *See* Pet. 16–25.
Although Petitioner supports this argument with new evidence in its Reply,
the Reply does not raise a new issue or argument.  *See Chamberlain Group,*

*Inc. v. One World Techs., Inc.*, 944 F.3d 919, 925 (Fed. Cir. 2019) ("Parties are not barred from elaborating on their arguments on issues previously raised."). Moreover, Patent Owner has had an adequate opportunity to address this new evidence in its Sur-Reply. *See In re NuVasive, Inc.*, 841 F.3d 966, 972 (Fed. Cir. 2016) (finding "an opportunity to respond was needed when the petitioner . . . newly pointed to a previously unmentioned portion of the . . . prior-art patent, even though it had earlier focused extensively on other portions of that prior-art patent").

Here, we find that Petitioner's arguments in its Reply rely on the arguments advanced in its Petition and respond directly to the narrow claim constructions for preamble and claim limitations [1.8]–[1.10] advanced by the Patent Owner. Accordingly, we will consider the "third" theory.

On the merits, Patent Owner raises two arguments, neither of which is persuasive. PO Sur-Reply 8–10. First, Patent Owner argues that the functions described by Dr. Freedman—(*f1* = {(D8, C5)}—are not described in Kalevo and the relationships between a non-directional class and a context class that are described are not mathematical. *Id.* at 8–9. We do not agree with either of these contentions. Whether Kalevo expressly discloses the functions described by Dr. Freedman is beside the point, because as Dr. Freedman persuasively explains, Ex. 1021 ¶¶ 60–62—Kalevo would suggest these functions to a person of ordinary skill. *See In re Baird*, 16 F.3d 380, 383 (Fed. Cir. 1994) ("[A] reference must be considered not only for what it expressly teaches, but also for what it fairly suggests." (alteration in original)); *In re Aslanian*, 590 F.2d 911, 914 (CCPA 1979) (explaining that in determining obviousness, all references are assessed "on the basis of what they reasonably disclose and suggest to one skilled in the art" (quoting *In re*

*Baum*, 374 F.2d 1004, 1009 (CCPA 1967))).  We also disagree with Patent

Owner's contention that the relationships shown in Figure 4 are not

mathematical.  PO Sur-Reply 9.  As Dr. Freedman explains

> a POSITA would recognize that the mapping from the directional
> and non-directional classes D0 thru D10 to context classes C0
> thru C6 corresponds to a surjective mapping (i.e., a many-to-one
> mapping in which every context class C0 through C6 has at least
> one directional or non-directional class D0 through D10 mapped
> to it), which is a concept known in discrete mathematics (see
> Johnsonbaugh, R. "Discrete Mathematics" (2009), [EX1013]),
> as does the search operation for looking up the entries in Table 4
> indexed by the classes of the L block and the U block
> respectively.

Ex. 1003 ¶ 140.  We find this opinion to be logical and reasonable and well-

supported by the cited evidence, so we give it substantial weight.

Second, Patent Owner argues that "the now-alleged expressions (*f1*)

'represent[ing]' the class mapping fail anyway because *f1* is not used if the

***intra mode*** determined for the neighboring block is the non-directional

***mode***."  PO Sur-Reply 9.  Patent Owner contends that "*Kalevo's* non-

directional classes D8, D9, and D10 respectively correspond to flat, smooth

texture, and coarse texture block features."  *Id.* (citing Ex. 1004 ¶ 41).

Patent Owner asserts "[t]hese are—as Petitioner correctly states—'non-

directional ***classes***,' *NOT* non-directional intra modes."  *Id.*  Finally, Patent

Owner argues that

> Even if a flat block is typically predicted in a DC mode, it is not
> itself an intra mode and does not characterize an intra mode
> (unlike directionalities of prediction). Thus, *f1* does not
> constitute a first set of mathematical expressions used if a non-
> directional ***intra mode*** is determined for a neighboring block.

*Id.* at 10.

We have reviewed the evidence cited by Patent Owner and it does not sufficiently support the broad assertion that Kalevo's non-directional classes are not non-directional intra modes. Dr. Freedman, on the other hand, has repeatedly and consistently testified that non-directional classes of Kalevo are non-directional intra modes. *See, e.g.*, Ex. 1003 ¶ 140. Patent Owner does not point us to any cross examination testimony of Dr. Freedman or even any testimony of Dr. Reader on this point. Without sufficient evidence or persuasive argument to rebut it, we give Dr. Freedman's testimony that the non-directional classes of Kalevo are non-directional intra modes, substantial weight.

Patent Owner's remaining arguments center on its contention that the preamble is limiting, and the claimed method must be performed by a decoder. PO Resp. 18–24. Patent Owner asserts that some of the Petition's identified mathematical expressions (e.g., Kalevo's equation for calculating gradients, *see* Pet. 47–48) are only used for determining the neighboring block's intra mode (limitation [1.1]), not determining the current block's intra-mode (limitations [1.2], [1.8]). *See* PO Resp. 25–30. However, even accepting that the preamble is limiting and the method must be performed by a decoder, we find that Petitioner's so-called "third" theory maps claim 1 to steps performed by the decoder. Pet. Reply 8–15. Accordingly, Patent Owner's arguments relating to the "decoder" are not persuasive. Instead, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Kalevo and Song account for the claimed "decoding apparatus" (limitation [1.0]). Pet. 16; Ex. 1003 ¶¶ 63–65.

On the entire record and for the reasons explained above, we determine that Petitioner has shown by a preponderance of the evidence that

Kalevo teaches or suggests limitations [1.8]–[1.10].  Patent Owner raises no other arguments for claim 1.  *See generally* PO Resp. (arguing only with respect to claim 1 and only with respect to limitations [1.8]–[1.10] and the preamble).  We have reviewed the arguments and evidence as to remaining limitations of claim 1 and the motivation to combine Kalevo and Song, and we determine that the Petition has shown by a preponderance of the evidence that the combination of Kalevo and Song teaches or suggests each limitation and that a person of ordinary skill would have been motivated to combine Kalevo and Song in the manner suggested.  Therefore, we adopt Petitioner's contentions regarding limitations [1.1]–[1.7] and the motivation to combine Kalevo and Song (Pet. 16–38) as our own.  Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 would have been unpatentable as obvious over the combination of Kalevo and Song.

d. Conclusion

Based on our review of Petitioner's argument and evidence of record, and for all the reasons expressed above, we conclude that Petitioner *has established* by a preponderance of evidence that claim 1 is unpatentable as obvious over Kalevo and Song.

*2. Dependent Claim 4*

Claim 4 depends from claim 1 and further recites

wherein determining the intra mode for the current block comprises: determining candidate intra modes based on whether the intra mode for the neighboring block is the directional mode or the non-directional mode; and selecting the intra mode for the current block among the candidate intra modes.

Ex. 1001, 12:10–18.

Petitioner relies on its arguments regarding claim 1, described above, and further relies on Kalevo's description of determining a "subset of prediction methods . . . according to the context information of the neighbouring blocks L, U," as shown in Table 4 of Kalevo.  Pet. 58–60; Ex. 1004 ¶¶ 78, 143.  According to Petitioner, Kalevo describes that "[e]ach row of Table 4 defines the prediction method subset for a certain pair of context classes for neighbouring blocks L, U…" and that "each combination of context classes for the neighboring blocks of a current block results in a subset of six possible prediction methods, or candidate intra modes, for the current block."  Pet. 58 (quoting Ex. 1004 ¶ 78); Ex. 1004 ¶ 143.  Kalevo then "select[s] the prediction method from a subset of prediction methods."  Ex. 1004 ¶ 143.  Petitioner also relies on the testimony of Dr. Freedman in support of its arguments.  Ex. 1003 ¶¶ 164–168.

Patent Owner raises no separate arguments for claim 4.  *See generally* PO Resp. (arguing only with respect to claim 1).  We have reviewed the arguments and evidence as to claim 4, and we determine that the Petition has shown by a preponderance of the evidence that the combination of Kalevo and Song teaches or suggests each limitation.  Therefore, we adopt Petitioner's contentions regarding claim 4 (Pet. 58–60) as our own.  Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 4 would have been unpatentable as obvious over the combination of Kalevo and Song.

### 3. Summary

For all the reasons expressed above, we conclude that Petitioner has shown by a preponderance of evidence that the combination of Kalevo and Song renders claims 1 and 4 unpatentable as obvious under § 103(a).

## G. MOTION TO AMEND

### 1. Proposed Substitute Claim 19

Proposed substitute claim 19 is independent. Claim 19 is proposed as a substitute for claim 1 in the event we find claim 1 unpatentable, and claim 19 is set out below, showing added language underlined and deleted language struck out in comparison to challenged claim 1.

[19.Pre] [[1. ]]19. A video decoding method performed by a video decoding apparatus, the method comprising:

[19.1] determining an intra mode for a neighboring block of a current block;

[19.2] determining an intra mode for the current block based on whether the intra mode for the neighboring block is a directional mode or a non-directional mode;

[19.3] performing intra-prediction according to the intra mode for the current block to generate a prediction block for the current block;

[19.4] obtaining quantization coefficients from an input bitstream;

[19.5] dequantizing the quantization coefficients to generate transform coefficients;

[19.6] transforming the transform coefficients to a residual block for the current block; and

[19.7] adding the prediction block and the residual block to reconstruct the current block,

[19.8] wherein the intra mode for the current block is determined by using a first set of one or more mathematical expressions, if the intra mode for the neighboring block is the non-directional mode,

[19.9] wherein the intra mode for the current block is determined by using a second set of one or more mathematical expressions, if the intra mode for the neighboring block is the directional mode,[[ and]]

[19.10] wherein the second set of one or more mathematical expressions is different from the first set of one or more mathematical expressions[[.]],

[19.11] wherein the second set used by the video decoding apparatus in response to the intra mode for the neighboring block being determined as the directional mode comprises a mathematical expression that is not included in the first set, and the first set used by the video decoding apparatus in response to the intra mode for the neighboring block being determined as the non-directional mode comprises a different mathematical expression that is not included in the second set,

[19.12] wherein the mathematical expression included in the second set and not included in the first set corresponds to an arithmetic operation between two values in order to yield a third value, and

[19.13] wherein the intra mode determined for the neighboring block is represented by an integer among a plurality of predetermined integers, the plurality of predetermined integers commonly identifying intra modes available to be determined for the neighboring block and the current block, and all the intra modes available to be determined for the neighboring block are same as all the intra modes available to be determined for the current block.

Rev. Mot. Amend, App'x A.

*2. Principles of Law*

In an *inter partes* review, amended claims are not added to a patent as of right, but rather must be proposed as a part of a motion to amend. 35 U.S.C. § 316(d) (2018). The Board must assess the patentability of proposed substitute claims "without placing the burden of persuasion on the patent owner." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1328 (Fed. Cir. 2017) (en banc); *see also Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 15 at 3–4 (PTAB Feb. 25, 2019) (precedential). Subsequent to the issuance of *Aqua Products*, the Federal Circuit issued a decision in *Bosch Automotive Service Solutions, LLC v. Matal*, 878 F.3d 1027 (Fed. Cir. 2017) ("*Bosch*"), as well as a follow-up Order amending that decision on rehearing. *See Bosch Auto. Serv. Sols., LLC v. Iancu*, No. 2015-1928 (Fed. Cir. Mar. 15, 2018) (Order on Petition for Panel Rehearing). In accordance with *Aqua Products*, *Bosch*, and *Lectrosonics*, a patent owner does not bear the burden of persuasion to demonstrate the patentability of the substitute claims presented in the motion to amend. Rather, ordinarily, "the petitioner bears the burden of proving that the proposed amended claims are unpatentable by a preponderance of the evidence." *Bosch*, 878 F.3d at 1040 (as amended on rehearing); *see Lectrosonics*, Paper 15 at 3–4. In determining whether a petitioner has proven unpatentability of the substitute claims, the Board focuses on "arguments and theories raised by the petitioner in its petition or opposition to the motion to amend." *Nike, Inc. v. Adidas AG*, 955 F.3d 45, 51 (Fed. Cir. 2020).

Patent Owner's proposed substitute claims, however, must meet the statutory requirements of 35 U.S.C. § 316(d) and the procedural requirements of 37 C.F.R. § 42.121. *Lectrosonics*, Paper 15 at 4–8.

Accordingly, Patent Owner must demonstrate: (1) the amendment proposes a reasonable number of substitute claims; (2) the proposed claims are supported in the original disclosure (and any earlier filed disclosure for which the benefit of filing date is sought); (3) the amendment responds to aground of unpatentability involved in the trial; and (4) the amendment does not seek to enlarge the scope of the claims of the patent or introduce new subject matter.  *See* 35 U.S.C. § 316(d); 37 C.F.R. § 42.121.

### 3. Statutory and Regulatory Requirements

Below we address whether Patent Owner's proposed substitute claims meet the statutory requirements of 35 U.S.C. § 316(d) and the procedural requirements of 37 C.F.R. § 42.121 recited above.  We address each of these requirements in turn.

### a. Reasonable Number of Substitute Claims

A motion to amend must "propose a reasonable number of substitute claims."  35 U.S.C. § 316(d)(1)(B); *see* 37 C.F.R. § 42.121(a)(3) ("A motion to amend may cancel a challenged claim or propose a reasonable number of substitute claims.").  Patent Owner proposes one substitute claim for challenged claim 1.  Rev. Mot. Amend 2.  "There is a rebuttable presumption that a reasonable number of substitute claims per challenged claim is one (1) substitute claim." *Lectrosonics*, Paper 15 at 4; *see* 37 C.F.R. § 42.121(a)(3).  Petitioner does not argue otherwise.  *See generally* Opp. Therefore, we determine that Patent Owner proposes a reasonable number of substitute claims.

     b. Respond to a Ground of Unpatentability

"A motion to amend may be denied where . . . [t]he amendment does not respond to a ground of unpatentability involved in the trial." 37 C.F.R. § 42.121(a)(2)(i).  Patent Owner asserts that the proposed substitute claim is patentable over the combination of references that forms the basis of the obviousness ground on which we instituted trial.  Rev. Mot. Amend 12–19. Petitioner does not argue otherwise.  *See generally* Opp.  We determine that the amended language in the proposed substitute claim is responsive to a ground of unpatentability involved in this trial.

     c. Scope of the Claim

Patent Owner asserts that the substitute claim is narrower than the corresponding original claim.  Rev. Mot. Amend 2.  Petitioner does not argue otherwise.  We determine that the proposed substitute claim is narrower in scope than original claim 1.

     d. Support in the Original Disclosure

A motion to amend may not present substitute claims that introduce new subject matter.  35 U.S.C. § 316(d); 37 C.F.R. § 41.121(a)(2)(ii).  New matter is any addition to the claims without support in the original disclosure.  *See TurboCare Div. of Demag Delaval Turbomach. v. Gen. Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) ("When [an] applicant adds a claim . . . the new claim[] . . . must find support in the original specification.").  To evaluate compliance with the prohibition on amendments that add new matter,

> the Board requires that a motion to amend set forth written description support in the originally filed disclosure of the subject patent for each proposed substitute claim, and also set forth support in an earlier filed disclosure for each claim for

which benefit of the filing date of the earlier filed disclosure is
sought.

*Lectrosonics*, Paper 15 at 7.

The revised MTA provides a listing of purported written description
support in the originally filed disclosures for the proposed substitute claim,
namely, that the claim is supported by the original application of the '849
Patent, U.S. Patent Application No. 15/260,240 ("the '240 Application,"
Ex. 2014), as well as the parent U.S. Patent Application No. 12/977,928
("the '928 Application," Ex. 2015) and Korean Priority Application No. 10-
2009-0134017 ("the KR Application," Ex. 2018). Rev. Mot. Amend 3–11.
With respect to limitation [19.1], "determining an intra mode for a
neighboring block of a current block," Patent Owner cites the '240
Application (Exhibit 2014) at 18:1–20:2 and the '928 Application (Exhibit
2015)[6] at 18:1–20:2 as alleged support for this limitation.

Petitioner argues that substitute claim 19 is also not supported by the
written description of the '849 Patent, and as such, is unpatentable under
35 U.S.C. § 112. Opp. 12–25. In particular, Petitioner contends that at least
limitation [19.1] of substitute claim 19 is not supported by the '240
Application. Opp. 13. Petitioner argues that a POSITA would not have
understood that the inventors were in possession of, and actually invented,
the invention in substitute claim 19, because "the '240 Application does not
**determine** an intra mode for a neighboring block of a current block and does
not describe an invention that relies on a determined intra mode for a
neighboring block of a current block and does not describe an invention that

---

[6] The citations to the '928 Application are identical to those for the '240
Application and the text is the same between the two; for ease of reference,
we hereafter cite only to the '240 Application.

relies on a determined intra mode for a neighboring block." *Id.*  Petitioner submits that "at best, the '240 Application discloses an exploratory process by which multiple intra modes for the neighboring block are evaluated, but it never describes, consistent with the written description standard, a process that includes determining the intra mode of the neighboring block." *Id.* at 13–14.

To satisfy § 112, the written description must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2012) (internal citations and quotations omitted).  This standard requires evaluation of "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.*  In other words, "the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Id.*

Patent Owner responds that the specification provides an example in which *i* that is used in Equation 2 is the "intra mode number" for the neighboring block and is determined as 0 through 8 in the process of setting the intra mode for the current block.  PO Reply 10.  Patent Owner argues that Petitioner's argument relies on Petitioner's interpretation of "determining," which is incorrect.  *Id.*  Patent Owner submits that the proper interpretation of "determining" should include "specifying or identifying a value." *Id.* at 11.  Patent Owner asserts that this definition is consistent with the Specification and prosecution history.  In particular, Patent Owner points to the prosecution of a continuation of the '849 patent, U.S. Application

No. 15/447,055, which includes similar claim language to proposed substitute claim 19. *Id.* Patent Owner notes that in order to overcome a § 112 rejection and obtain an Allowance, the Applicant pointed to *i* in Equation 2 as an embodiment of the intra mode "determin[ed]" for the neighboring block. *Id.* at 12 (citing Ex. 1007, 156, 162–163). Moreover, Patent Owner argues that Petitioner's construction is incorrect because it would exclude a preferred embodiment. *Id.* Thus, Patent Owner concludes that

> a POSITA would understand an example of the claimed determining is disclosed in the specification with reference to specifying or identifying (i.e., determining) a value for i ("the intra mode number" for the neighboring block). Per this example, "[w]henever the neighboring block intra mode, i, for the cost function is determined as a directional mode (i = 0, 1, 3-8), the decoder chooses to apply the directional equation that leverages that directional property" and "[w]henever the neighbor block intra mode, i, for the cost function is determined as a non-directional mode (2), the decoder chooses to use the DC intra mode equation that calculates an average without directionality."

*Id.* (quoting Ex. 2017 ¶¶ 17, 19).

The '240 application discloses that a mode selector selects "a mode suitable for a current block from along a plurality of intra modes using *directionality of neighboring blocks of the current block*." Ex. 2014, 18:2–3 (emphasis added). The '240 application further discloses:

> First, the mode selector 210 or 540 calculates a cost $C_i$, with respect to *a specific directionality i* by means of a sum (or an average) of deviations according to the directionalities using Equation 2 below.
>
> [Equation 2]

$$C_i = \sum_{k=0}^{n-1} D_{ik}$$

In Equation 2, n is the number of pixel pairs k for calculating the deviation, *i is the intra mode number*, and $D_{ik}$ is the deviation between the pixel pairs k corresponding to *the specific directionality i*. The symbol n may be selected by another number depending on an embodiment. In example embodiments of the present invention, the description will be made on the assumption that n is set to 12.

Ex. 2014, 18:9–18 (emphasis added).

In the '240 Application, "a cost $C_i$ with respect to a specific directionality i" is calculated using Equation 2 for each candidate intra mode; for example, the "cost $C_0$ of the vertical direction" (mode 0) "is obtained by selecting 12 pixel pairs in the vertical direction from among adjacent pixels of the neighboring blocks." Ex. 2014, 18:19–22. After the cost $C_0$ for the candidate intra vertical mode is calculated, the '240 Application describes calculating the cost for the other intra modes numbered 1 through 8, such that costs $C_0$ through $C_8$ are ultimately determined. *See* Ex. 2014, 19:3–4, 19:12–15; 19:21–23; Ex. 1021 ¶¶ 72–73.

After this process, the '240 Application has nine cost values, corresponding to nine directionality scenarios for pixels in the neighboring blocks. *See* Ex. 2014, 20:3–7. The '240 Application explains that, because it describes that "mode selector 210 or 540 can calculate the costs $C_i$ of a total of nine intra modes . . . and then select one having a minimum cost from among the intra modes" and it clarifies that this cost calculation is done "to select the intra mode **suitable for the current block**." Ex. 2014, 20:3–9 (emphasis added); *see id.* at 25:10–15 (original claim 8, describing calculating costs "on a plurality of directions in the at least one neighboring

block" and selecting "an intra mode" for the current block); Ex. 2017 ¶ 20 (explaining the process uses the smallest cost value as the intra mode of the current block); Ex. 1021 ¶¶ 72, 73 (describing the process shown in Figures 7A–7H); Ex. 1035 ¶¶ 65, 66 (describing how the cost calculation iterates through the nine hypothetical intra modes).

Patent Owner does not dispute this description of the operation of the process described in the '240 Application, but it does dispute the meaning of the variable "$i$".  PO Reply 10; *see also* Opp. 16 n.9 (discussing the parties dispute).  In the Preliminary Guidance, we assumed that the variable $i$ in the passage describing Equation 2 (*see supra* at 42) corresponds to both the directionality and the intra mode of the neighboring block.  *See* Prelim. Guid. 7.  Based, in part, on that assumption, we determined that Patent Owner had met the statutory and regulatory requirements for a motion to amend and that, on the initial record, Petitioner had not shown a reasonable likelihood that the claim limitation [19.1] (which was the same as the current version of limitation [19.1] lacked written description support.  *See id.*  Upon review of the entire record, we agree with Petitioner that the variable $i$ in Equation 2 refers to the intra mode of the current block, not the intra mode of the neighboring block as we preliminarily determined and Patent Owner contends.

The fundamental problem with Patent Owner's analysis, and where we went astray in our Preliminary Guidance, begins with Patent Owner's assertion that the '240 Application uses "directionality" and "intra mode" synonymously.  Ex. 2001 ¶ 58; Ex. 2017 ¶ 14.  Instead, our detailed review of the '240 Application on this complete record shows that the two terms are not synonymous—they are closely related, but not the same.  For example,

in the Related Art section, the '240 Application describes H.264 having

"nine prediction modes including a total of eight modes (modes 0, 1, and 3

through 8) having *directionality*." Ex. 2014, 3:10–13. Also, in the

Summary of the Invention the '240 Application states

> The performing an intra-prediction according to a directionality
> of the selected intra mode to reconstruct the current block may
> includes: obtaining a prediction block of the current block from
> the at least one neighboring block *according to the directionality*
> of the selected mode; and reconstructing the current block by
> adding the residual signal of the current block and the prediction
> block.

Ex. 2014, 7:24–8:4 (emphasis added). Again and again, the '240

Application makes clear that *directionality* and *intra mode* are related, but

distinct concepts. They are not interchangeable as Patent Owner argues.

On this point, we find Dr. Freedman's explanation in Paragraph 68 of

his Third Declaration on the relationship between "intra mode" and

"directionality" to be particularly well-reasoned and persuasive. As

Dr. Freedman explains

> Throughout the '240 Application, the text uses the term
> "directionality" to refer to characteristics of neighboring blocks,
> whereas the term "intra mode" is used when referring to the
> current block. For example, the '240 Application describes that
> "directionality" of neighboring blocks is "estimated from the
> neighboring blocks" that "have already been reconstructed"
> while the "intra mode" is selected for the current block for
> purposes of reconstructing that current block. *See, e.g.*, '240
> Application (Ex-2014), 11:14–12:4, 25:10–15. This is likely
> because the neighboring blocks "have already been
> reconstructed" and thus, the intra mode number that was used in
> reconstructing those blocks is no longer pertinent. Instead, what
> is pertinent in the '240 Application's method is the directionality
> characteristic of those neighboring blocks. Phrased differently,
> in the '240 Application, ***directionality*** is a concept that is

> evaluated ***after performance of intra prediction*** (i.e., after
> reconstruction), whereas the ***intra mode*** or number is a concept
> used ***during performance of intra prediction***. . . . They are not
> equivalent in the context of the '240 Application. . . .

Ex. 1035 ¶ 68 (footnote omitted). This is further supported by evidence
cited by Dr. Freedman that other references in this field make a similar
distinction between directionality and intra mode. *Id.* ¶ 68 n.4 (citing
Ex. 1032, Abstract). Thus, we agree with Dr. Freedman that these terms are
not "synonymous" as Dr. Reader and Patent Owner contend.

This error infects Patent Owner's and Dr. Reader's entire written
description analysis and leads to the second more significant error, i.e., that
the '240 Application says that the variable $i$ is the intra mode of the
neighboring block. *See* Opp. 18–19; Ex. 2017 ¶¶ 14–20 (analysis relying on
the assumption that directionality and intra mode are the same). With the
proper understanding of "intra mode" and "directionality," we agree with
Petitioner and Dr. Freedman that "the variable $i$ does not refer to the intra
mode of a neighboring block. According to Dr. Freedman, a POSITA would
instead have understood the variable $i$ to refer to the intra mode that is to be
determined for the current block that is undergoing the decoding process."
Ex. 1035 ¶ 63.

This makes sense. Patent Owner's contention that $i$ is the "intra mode
number" for the neighboring block, begs a number of questions. *See*
Opp. 20; Ex. 2017 ¶ 14; PO Reply 12. For instance, if $i$ is the intra mode of
the neighboring block, which neighboring block? A review of any of
Figures 7A–7H illustrates why this question exposes the flaws in Patent
Owner's and Dr. Reader's analysis. For example, Figure 7A of the '240
Application illustrates the cost calculation for mode 0.

## FIG. 7A



Figure 7A shows an example of calculating the cost of a vertical direction. As the '240 Application explains

> The cost $C_0$ of the vertical direction is obtained by selecting 12 pixel pairs in the vertical direction from among adjacent pixels of the neighboring blocks of the current block, and calculating a sum of deviations with respect to each pixel pair as in Equation 2.

Ex. 2014, 18:19–23. As Figure 7A illustrates, the cost calculation centers on the current block, not the neighboring blocks, which is unusual if $i$ is the intra mode of a neighboring block. Ex. 1021 ¶¶ 75–77; *see* Opp. 19. Moreover, as shown in Figure 7A, the pixel pairs selected of the neighboring blocks spans *four different* neighboring blocks. Patent Owner never explains which of these four blocks the variable $i$ is supposedly representing. Given this disclosure, we find Dr. Freedman's testimony in Paragraph 66 of his Third Declaration to be persuasive in how this process works

> In other words, the '240 Application's technique of determining, or selecting, the intra mode suitable for the current block evaluates nine hypothetical scenarios for the current block, where each scenario corresponds to an intra mode. Each scenario evaluates a different arrangement of pixel pairs in neighboring blocks to determine the cost associated with applying the scenario to the current block, using Equations 2 and 3. That is to say, the cost $C_i$ is the cost associated with using the intra mode $i$ for the current block. Thus, for example, if the vertical intra mode (mode 0) is determined to be applied to the current block, that means that the cost $C_0$ was the lowest cost out of the costs $C_0$ through C. *See* Ex-1022, 28:20–24. If the non-directional mode (mode 2) is determined to be applied to the current block, that means that the cost $C_2$ was the lowest cost out of the costs $C_0$ through $C_8$. *See id.* at 28:21–29:6.

Ex. 1035 ¶ 66. This is shown in this flowchart Dr. Freedman provided in his second declaration and reproduced below.



Above is a flow chart provided by Dr. Freedman illustrating the algorithm to determine intra mode used in the '240 Application. Opp. 21; Ex. 1021 ¶ 88. Patent Owner and Dr. Reader offer no persuasive argument to rebut this interpretation. Given the flaws and holes we have identified in Dr. Reader's

testimony, we find that it is entitled little weight on the question of whether the '240 Application supports limitation [19.1] of proposed substitute claim 19. Instead, relying on Dr. Freedman's persuasive testimony and based on this correct interpretation of the process described in the '240 Application, we determine that a preponderance of the evidence shows that limitation [19.1] is not supported by the '240 Application, as filed. *See* Ex. 1021 ¶¶ 69–80; Ex. 1035 ¶¶ 60–79. We further find that, given what we see now as the correct interpretation of the variable *i*, we determine that Patent Owner has failed to carry its burden of showing that the proposed replacement claim 19 does not add new matter.[7] *See* Ex. 1021 ¶¶ 69–80; Ex. 1035 ¶¶ 60–79; 35 U.S.C. § 316(d); 37 C.F.R. § 41.121(a)(2)(ii).[8]

We write further to explain why even under our prior, incorrect interpretation of the variable *i*, as denoting the intra mode of the neighboring

---

[7] As for Patent Owner's contentions regarding the prosecution of the related application (PO Reply 11–12 (citing Ex. 1007, 156)), we agree with Petitioner that the rejection in that child application involved indefiniteness and not written description and is, therefore, unpersuasive. Pet. Sur-Reply 2.

[8] Patent Owner contends that it is somehow improper for Petitioner to raise a contention that limitation [19.1] lacks written description support. PO Reply 10. We agree with Petitioner that there is nothing improper with Petitioner maintaining arguments it believes to be meritorious or where we might have misapprehended arguments in the original opposition. We further see nothing improper with it challenging limitations that might have been in the original challenged claims. The proposed substitute claims stand or fall on their own and may be challenged on other possible grounds of unpatentability. *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1352 (Fed. Cir. 2020) ("the Board's authority with respect to new and amended claims necessarily extends to other possible grounds of unpatentability, in particular, a failure to comply with section 112."); *Amazon.com, Inc. v. Uniloc Luxembourg S.A.*, IPR2017-00948, Paper 34 at 5 (PTAB Jan. 18, 2019) (precedential).

block, we determine that Patent Owner has not shown that proposed substitute claim 19, and in particular limitation [19.1], has written description support.[9]

In its Opposition, Petitioner argues that, under the proper construction, limitation [19.1] of proposed substitute claim 19 requires "a conclusive establishment of a singular intra mode for a neighboring block." Opp. 16. Petitioner contends that "[t]he '240 Application does not conclusively establish a singular intra mode of a neighboring block according to [this] interpretation . . . , and thus, the '240 Application does not provide written description support for this claim limitation." *Id.* Petitioner argues that the '240 Application describes evaluating nine hypothetical directionality scenarios for the pixels of neighboring blocks, each of which corresponds to one of nine intra modes to be used for the current block, performing cost calculations for each of those nine hypothetical directionality scenarios, and picking one of the nine intra modes for the current block based on its associated cost. *Id.* at 16–18 (citing Ex. 1022, 27:11–13). Petitioner asserts that, "in this process, there is no conclusive establishment of a singular intra mode for a neighboring block." *Id.* at 18.

Patent Owner argues that this contention depends on Petitioner's interpretation of "determining." PO Reply 10. Patent Owner contends that the proper interpretation of "determining" includes "specifying or identifying a value." *Id.* at 11. Patent Owner contends that "POSITA would

---

[9]  For this section, we analyze whether Patent Owner has shown written description support for proposed substitute claim 19 using our incorrect interpretation in the Preliminary Guidance that the variable $i$ in the '240 Application corresponds to the intra mode of the neighboring block.

understand an example of the claimed determining is disclosed in the specification with reference to specifying or identifying (i.e., determining) a value for $i$ ('the intra mode number' for the neighboring block)." *Id.* at 12. Patent Owner argues that "[p]er this example, '[w]henever the neighboring block intra mode, i, for the cost function is determined as a directional mode ($i$ = 0, 1, 3-8), the decoder chooses to apply the directional equation that leverages that directional property' and '[w]henever the neighbor block intra mode, $i$, for the cost function is determined as a non-directional mode (2), the decoder chooses to use the DC intra mode equation that calculates an average without directionality.'" *Id.* (citing Ex. 2017 ¶¶ 17, 19).

As explained above, the '240 Application describes evaluating nine hypothetical directionality scenarios for the pixels of neighboring blocks, each of which corresponds to one of nine intra modes to be used for the current block, performing cost calculations for each of those nine hypothetical directionality scenarios, and picking one of the nine intra modes for the current block based on its associated cost. *See* Ex. 1022, 27:11–13. We find that even under Patent Owner's interpretation of the variable $i$ in Equation 2, we agree with Petitioner that in the process described in the '240 Application, there is no "determination" of a singular intra mode for a neighboring block. *See* Opp. 16–25; Pet. Sur-Reply 1–6. This is true even under Patent Owner's construction of "determining" as "specifying or identifying a value." *See* Pet. Sur-Reply 1–2. In particular, the '240 Application does not "specify" or "identify" (or "determine") a single intra mode for the neighboring block—it merely examines the separate concept of directionality among pixel pairs in the neighboring block. Ex. 2014, 18:9–18. We agree with Petitioner, as explained above, *see supra* pp. 42–44,

there is no determination of a single intra mode for the neighboring block, but instead, the intra modes are hypothetical scenarios for application to the current block while calculating costs with respect to neighboring block pixel pairs—thus, no intra mode used to decode a neighboring block is needed much less determined. Ex. 1035 ¶ 68. This is shown in the flowchart Dr. Freedman provided in his second declaration that we reproduced *supra*. Even under the incorrect interpretation of the variable $i$, the flow chart demonstrates that no intra mode is specified for the neighboring blocks. Ex. 1035 ¶¶ 62–67. Instead, we agree with Petitioner that the '240 Application never specifies a single intra mode of the neighboring block—it evaluates nine hypothetical intra mode scenarios corresponding to the neighboring blocks' pixels, but never determines the intra mode of a neighboring block: the mode selector 540 always "calculate[s] the costs $C_i$ of a total of nine intra modes" (Ex. 2014, 20:3–5); it does not limit its cost calculation to one of (or a subset of) those intra modes, based on the intra mode of a neighboring block. Ex. 1021 ¶¶ 89–90; Ex. 1035 ¶¶ 73–74.

We also agree with Petitioner that this distinction can also be explained based on the following hypothetical arrangement of blocks as depicted below.



A cartoon showing a current block, an upper neighbor block (having intra mode 2), and a left neighbor block (having intra mode 0). Opp. 23. Here, one neighboring block was predicted in a directional mode (mode 0, the vertical direction), with another neighboring block being predicted in the nondirectional mode (mode 2). *Id.* But the mode used for either neighboring block is of no moment and is never actually specified or identified. *Id.* According to the disclosure of the '240 Application, in this example, to determine the intra mode to apply to the Current Block, the decoder calculates costs $C_0$ through $C_8$, using Equations 2 and 3, for each intra prediction mode 0 through 8 to determine the appropriate intra prediction mode for the Current Block. *Id.* (citing Ex. 1021 ¶¶ 91–92; Ex. 2014, 20:3–7; Ex. 1035 ¶¶ 76–77). We find Dr. Freedman's testimony persuasive that the process iterates through all nine hypothetical modes occurs no matter what the value is for the intra mode for the neighboring blocks. *See* Ex. 1021 ¶ 92.

The record evidence shows that the methods of the '240 Application do not specify or identify an actual intra mode of the neighboring block;

rather, the methods must always evaluate each of the 9 scenarios. Ex. 1021 ¶ 95; Ex. 2014, 20:3–7; Ex. 1035 ¶ 78. Thus, the '240 Application does not describe the determination of a neighboring block's intra mode, under either party's construction or under either the correct interpretation of the process described in the '240 Application or our prior, incorrect interpretation. Thus, we determine that Petitioner has shown by preponderance of the evidence that the '240 Application does not support limitation [19.1]. Accordingly, we find that claim 19 fails to satisfy the requirement that a proposed substitute claim not introduce new matter over the originally filed application.

## III. CONCLUSION

In summary,

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 4 | 103 | Kalevo, Song | 1, 4 | |
| | | **Overall Outcome** | 1, 4 | |

| Motion to Amend Outcome | Claim |
|---|---|
| Substitute Claims Proposed in the Amendment | 19 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | 19 |
| Substitute Claims: Not Reached | |

## IV. ORDER

For the reasons given, it is:

ORDERED that Petitioner *has shown* based on a preponderance of evidence that claims 1 and 4 of U.S. Patent No. 9,641,843 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Revised Motion to Amend is *denied*; and

FURTHER ORDERED because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Raghav Bajaj
David McCombs
Ohathan Bowser
HAYNES AND BOONE, LLP
Raghav.bajaj.ipr@haynesboone.com
David.mccombs.ipr@haynesboone.com
Jon.bowser.ipr@haynesboone.com

Roshan Mansinghani
Ashraf Fawzy
UNIFIED PATENTS, LLC
roshan@unifiedpatents.com
afawzy@usnifiedpatents.com

PATENT OWNER:

William H. Mandir
Fadi Kiblawi
John R. Rabena
SUGHRUE MION, PLLC
wmandir@sughrue.com
fkiblawi@sughrue.com
jrabena@sughrue.com

US009641849B2

(12) **United States Patent**
Jeong et al.

(10) **Patent No.:**      **US 9,641,849 B2**
(45) **Date of Patent:**      *May 2, 2017

(54) **VIDEO ENCODING APPARATUS, VIDEO DECODING APPARATUS, AND VIDEO DECODING METHOD FOR PERFORMING INTRA-PREDICTION BASED ON DIRECTIONALITY OF NEIGHBORING BLOCK**

(71) Applicant: **ARISCALE INC.**, Daejeon (KR)

(72) Inventors: **Je Chang Jeong**, Daejeon (KR); **Soon Jong Jin**, Daejeon (KR); **Sang Jun Park**, Daejeon (KR); **Hyuk Lee**, Daejeon (KR)

(73) Assignee: **ARISCALE INC.**, Daejeon (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/260,240**

(22) Filed: **Sep. 8, 2016**

(65) **Prior Publication Data**

US 2016/0381366 A1     Dec. 29, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 12/977,928, filed on Dec. 23, 2010, now Pat. No. 9,467,705.

(30) **Foreign Application Priority Data**

Dec. 30, 2009     (KR) ........................ 10-2009-0134017

(51) **Int. Cl.**
  *H04N 7/12*      (2006.01)
  *H04N 19/159*      (2014.01)
  (Continued)

(52) **U.S. Cl.**
  CPC ........... *H04N 19/159* (2014.11); *H04N 19/11* (2014.11); *H04N 19/152* (2014.11);
  (Continued)

(58) **Field of Classification Search**
  CPC ... H04N 19/159; H04N 19/513; H04N 19/547
  (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,907,142 B2 *  6/2005  Kalevo ................ H04N 19/593
                                                    375/E7.265
9,237,357 B2 *  1/2016  Park ..................... H04N 19/176
  (Continued)

FOREIGN PATENT DOCUMENTS

KR      10-2009-0095316 A      9/2009

OTHER PUBLICATIONS

Satoshi Kondo et al., "A Motion Compensation Technique Using Sliced Blocks in Hybid Video Coding", IEEE International Conference on Image Processing, ICIP, Sep. 14, 2005, pp. 305-308, Matsushita Electric Industrial Co., Osaka, Japan.

*Primary Examiner* — Farzana Hossain

(57)      **ABSTRACT**

Provided are methods and apparatuses for improving compression efficiency in directional intra-prediction. A video encoding apparatus, which does not need to record intra mode information, includes a mode selector that selects one from among a plurality of intra modes on the basis of a directionality of at least one neighboring block that has already been reconstructed before a current block is reconstructed, an intra predictor that obtains a prediction block of the current block from the at least one neighboring block according to the directionality of the selected mode, and obtains a residual block by subtracting the prediction block from the current block, and a unit for encoding the obtained residual block.

**18 Claims, 11 Drawing Sheets**



0 (vertical)

Unified Patents Exhibit 1001
Page 1 of 20

**US 9,641,849 B2**

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 19/196* | (2014.01) |
| *H04N 19/176* | (2014.01) |
| *H04N 19/11* | (2014.01) |
| *H04N 19/152* | (2014.01) |
| *H04N 19/513* | (2014.01) |
| *H04N 19/547* | (2014.01) |
| *H04N 19/50* | (2014.01) |

(52) **U.S. Cl.**
 CPC ......... *H04N 19/176* (2014.11); *H04N 19/197* (2014.11); *H04N 19/513* (2014.11); *H04N 19/547* (2014.11); *H04N 19/50* (2014.11)

(58) **Field of Classification Search**
 USPC ......................................... 375/240.12, 240.13
 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2004/0062445 A1*   4/2004   Kim ........................ G06T 9/004
                                                                  382/238

| | | | |
|---|---|---|---|
| 2007/0133891 A1* | 6/2007 | Jeong ................... | H04N 19/176 |
| | | | 382/238 |
| 2007/0237228 A1* | 10/2007 | Han ..................... | H04N 19/105 |
| | | | 375/240.12 |
| 2009/0110069 A1* | 4/2009 | Jung ..................... | H04N 19/61 |
| | | | 375/240.12 |
| 2010/0128995 A1* | 5/2010 | Drugeon .......... | H04N 19/00733 |
| | | | 382/238 |
| 2010/0239002 A1* | 9/2010 | Park ..................... | H04N 19/176 |
| | | | 375/240.12 |
| 2010/0309977 A1* | 12/2010 | Andersson ........... | H04N 19/176 |
| | | | 375/240.12 |
| 2011/0038415 A1* | 2/2011 | Min .................... | H04N 19/115 |
| | | | 375/240.12 |
| 2011/0090967 A1* | 4/2011 | Chen ..................... | H04N 19/70 |
| | | | 375/240.16 |
| 2011/0293010 A1 | 12/2011 | Jeong et al. | |
| 2012/0140830 A1* | 6/2012 | Xu ..................... | H04N 19/176 |
| | | | 375/240.18 |

* cited by examiner

Unified Patents Exhibit 1001
Page 2 of 20



FIG. 1

FIG. 2

Unified Patents Exhibit 1001
Page 3 of 20

## FIG. 3

| M | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| I | a | b | c | d | | | | |
| J | e | f | g | h | | | | |
| K | i | j | k | l | | | | |
| L | m | n | o | p | | | | |

Unified Patents Exhibit 1001
Page 4 of 20

**FIG. 4**





FIG. 5

Unified Patents Exhibit 1001
Page 6 of 20



FIG. 6

Unified Patents Exhibit 1001
Page 7 of 20

## FIG. 7 A



## FIG. 7 B

## FIG. 7 C



3 (diagonal down-left)

## FIG. 7 D



4 (diagonal down-right)

Unified Patents Exhibit 1001
Page 9 of 20

## FIG. 7 E



5 (vertical right)

## FIG. 7 F



6 (horizontal down)

## FIG. 7G



7 (vertical left)

## FIG. 7H



8 (horizontal up)

Unified Patents Exhibit 1001
Page 11 of 20

## FIG. 8



12 pixels selected

Current Block

Unified Patents Exhibit 1001
Page 12 of 20

# FIG. 9



Unified Patents Exhibit 1001
Page 13 of 20

US 9,641,849 B2

**1**

VIDEO ENCODING APPARATUS, VIDEO
DECODING APPARATUS, AND VIDEO
DECODING METHOD FOR PERFORMING
INTRA-PREDICTION BASED ON
DIRECTIONALITY OF NEIGHBORING
BLOCK

CROSS-REFERENCE TO RELATED
APPLICATION

This application is a continuation of and claims priority to U.S. Application Ser. No. 12/977,928 filed Dec. 23, 2010, now U.S. Pat. No. 9,467,705, which claims priority to and the benefit of Korean Patent Application No. 2009-0134017, filed Dec. 30, 2009, the disclosures of which is are incorporated herein by reference in their entirety.

BACKGROUND

1. Technical Field

Example embodiments of the present invention relates to a video compression method and, more particularly, to a method and apparatus for improving compression efficiency in directional intra-prediction.

2. Related Art

With the development of telecommunication technologies including the Internet, video communication is increasing in addition to text communication and voice communication. It is insufficient to satisfy various desires of consumers with existing text-based communication. Thus, multimedia service capable of covering various types of information such as text, image, music, etc. is increasing. Multimedia data requires a high-capacity storage medium due to its enormous volume, and a wide bandwidth when transmitted. Thus, to transmit the multimedia data including text, video, and audio, it is essential to use a compression coding technique.

A fundamental principle of compressing data is based on a process of eliminating the redundancy from data. The data can be compressed by eliminating spatial redundancy referring to repetition of the same color or object in an image, temporal redundancy referring to little or nothing of variation between neighboring frames in a moving picture frame or successive repetition of same sound in the audio, or psycho-visual redundancy referring to dullness of human vision and sensation to high frequencies.

As a method of compressing this moving picture, a growing interest in H.264 or advanced video coding (AVC) that further improves compression efficiency compared to Moving Picture Experts Group-4 (MPEG-4) has recently been taken. As a scheme for improving the compression efficiency, H.264 employs directional intra-prediction (hereinafter, shortened simply to "intra-prediction") to eliminate spatial redundancy within a frame.

The intra-prediction refers to a method of coping with one sub-block in a designated direction using neighboring pixels in upward and leftward directions, predicting values of current sub-blocks, and encoding only the differences between the copied values and the predicted value of the sub-blocks. By contrast, inter-prediction or temporal prediction refers to a method of performing prediction with reference to the area 40 of a frame 20 having a difference of time, as shown in FIG. 1. This intra-prediction is complementary to the inter-prediction. In other words, one of the two prediction methods that is favorable for the image to be encoded is selectively used.

In the intra-prediction technique complying with the existing H.264 standard, a prediction block is generated from a current block on the basis of another block having a previous encoding sequence. A value subtracting the prediction block from the current block is encoded. In terms of a luminance component, the prediction block is generated in units of 4×4 blocks or 16×16 macroblocks. Nine prediction modes can be selected for each 4×4 block, whereas four prediction modes can be selected for each 16×16 macroblock. A video encoder based on H.264 selects one from among the selected prediction modes with respect to each block. In the selected prediction mode, a difference between the current block and the prediction block is minimized.

As the prediction mode for the 4×4 block, nine prediction modes including a total of eight modes (modes **0**, **1**, and **3** through **8**) having directionality and a direct current (DC) mode (mode **2**) using a mean value of eight neighboring pixels are used in H.264, as shown in FIG. **2**.

FIG. **3** shows an example of labeling for explaining the nine prediction models. In this case, a prediction block (areas including a through p) is generated from the current block using samples A through M that are previously decoded. Here, if E, F, G and H cannot be previously decoded, D is copied at their positions, so that E, F, G and H can be virtually generated.

The nine prediction modes will be described in detail with reference to FIG. **4**. In the case of mode **0**, pixels of the prediction block are estimated by extrapolation in a vertical direction using upper samples A, B, C and D. In the case of mode **1**, the pixels of the prediction block are estimated by extrapolation in a horizontal direction using left samples I, J, K and L. Further, in the case of mode **2**, the pixels of the prediction block are identically contrapositioned on the average of the upper samples A, B, C and D and the left samples I, J, K and L.

Further, in the case of mode **3**, the pixels of the prediction block are estimated by interpolation at an angle of 45° in an upper-right to lower-left (diagonal down-left) direction. In the case of mode **4**, the pixels of the prediction block are estimated by extrapolation at an angle of 45° in an upper-left to lower-right (diagonal down-right) direction. Further, in the case of mode **5**, the pixels of the prediction block are estimated by extrapolation at an angle of about 26.6° (width/height=½) in a vertical-right direction.

In addition, in the case of mode **6**, the pixels of the prediction block are estimated by extrapolation at an angle of about 26.6° in a horizontal-down direction. In the case of mode **7**, the pixels of the prediction block are estimated by extrapolation at an angle of about 26.6° in a vertical-left direction. Finally, in the case of mode **8**, the pixels of the prediction block are estimated by interpolation at an angle of about 26.6° in a horizontal-up direction.

Arrows of FIG. **4** indicate prediction directions in each mode. The samples of the prediction block in modes **3** through **8** can be generated from a weighted average of previously-decoded reference samples A through M. For example, in the case of mode **4**, the sample d located at the upper right edge of the prediction block can be estimated as in Equation 1 below. Here, round( ) is the integer round-off function.

$$d = round(B/4 + C/2 + D/4) \qquad \text{[Equation 1]}$$

Meanwhile, there are four modes **0**, **1**, **2**, and **3** in the 16×16 prediction model for a luminance component. In the case of mode **0**, the pixels of the prediction block are estimated from upper samples by extrapolation. In the case of mode **1**, the pixels of the prediction block are estimated from left samples by extrapolation. Further, in the case of mode **2**, the pixels of the prediction block are calculated by

Unified Patents Exhibit 1001
Page 14 of 20

US 9,641,849 B2

3

averaging the upper samples and left samples. Finally, in the case of mode 3, the pixels of the prediction block use a linear "plane" function that is fitted to the upper and left samples. This mode works well in areas of smoothly-varying luminance.

In this manner, the video encoder based on the H.264 standard performs intra-prediction using a total of nine modes including eight modes having directionality (hereinafter, referred to as "directional modes") and one DC mode. Intra mode information representing one of the nine modes obtained in this way is transmitted to a video decoder. The video decoder obtains a prediction block from a current block in the same method as the video encoder on the basis of the intra mode information, and reconstructs the current block from the obtained prediction block.

SUMMARY

However, since this intra mode information is given to each 4×4 block, it may act as an overhead increasing the size of a coded bitstream. This means that the intra mode information is required per 16 pixels, and thus is by no means a small amount compared to a result of encoding a residual.

Example embodiments of the present invention is directed to provide a video encoding method and apparatus, and a video decoding method and apparatus, for enhancing efficiency of intra-prediction in video coding.

It is to be understood that technical problems to be solved by the present invention are not limited to the aforementioned technical problems, and other technical problems which are not mentioned will be apparent from the following description to persons with ordinary skill in the art to which the present invention pertains.

In some example embodiments, there is provided a video encoding apparatus, which does not need to record intra mode information. The video encoding apparatus includes: a mode selector configured to select one from among a plurality of intra modes on the basis of directionality of at least one neighboring block, the at least one neighboring block having already been reconstructed before the current block is reconstructed; an intra predictor configured to obtain a prediction block of the current block from the at least one neighboring block according to the directionality corresponding to the selected mode, and configured to obtain a residual block by subtracting the prediction block from the current block; and means for encoding the obtained residual block.

In other example embodiments, there is provided a video decoding apparatus, which does not need to receive intra mode information. The video decoding apparatus includes means for reconstructing a residual signal of a current block from an input bitstream; a mode selector configured to select one from among a plurality of intra modes on the basis of directionality of at least one neighboring block, the at least one neighboring block having already been reconstructed before the current block is reconstructed; and an intra reconstructor configured to obtain a prediction block of the current block from the at least one neighboring block according to a directionality of the selected mode, and configured to reconstruct the current block by adding the residual signal of the current block and the prediction block.

In still other example embodiments, there is provided a video decoding method, which includes reconstructing a residual signal of a current block from an input bitstream; selecting one from among a plurality of intra modes; and performing an intra-prediction according to a directionality

4

of the selected intra mode to reconstruct the current block. The plurality of intra modes may use 34 modes for an 8×8 block. The 34 modes may have a maximum of 34 directions, each of which may be an arbitrary direction with respect to on the basis of an arbitrary pixel within the current block, the arbitrary direction may have a slope defined as dy in a vertical direction over dx in a horizontal direction, wherein dx and dy may be natural numbers. The number of the plurality of intra modes may be different depending on a block size. The plurality of intra modes may include at least one of 9 intra modes for a 4×4 block, 9 intra modes for an 8×8 block, 34 intra modes for a 16×16 block, 34 intra modes for a 32×32 block, 5 intra modes for a 64×64 block, and 5 intra modes for a 128×128 block. The selecting of one from among a plurality of intra modes may include selecting one from among the plurality of intra modes on the basis of a directionality of at least one neighboring block that has already been reconstructed before the current block is reconstructed. The performing an intra-prediction according to a directionality of the selected intra mode to reconstruct the current block may includes: obtaining a prediction block of the current block from the at least one neighboring block according to the directionality of the selected mode; and reconstructing the current block by adding the residual signal of the current block and the prediction block. The at least one neighboring block may include at least one of a upper block, a left block, a upper left block, and a upper right block with respect to the current block.

BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects, features and advantages of example embodiments of the present invention will become more apparent to those of ordinary skill in the art by describing in detail example embodiments thereof with reference to the attached drawings, in which:

FIG. 1 shows comparison of intra-prediction with inter-prediction;

FIG. 2 shows directionality of a conventional intra-prediction mode;

FIG. 3 shows an example of labeling for explaining the intra-prediction mode of FIG. 2;

FIG. 4 shows details of the intra-prediction mode of FIG. 2;

FIG. 5 is a block diagram showing the construction of a video encoder according to an example embodiment of the present invention;

FIG. 6 is a block diagram showing the construction of a video decoder according to an example embodiment of the present invention;

FIGS. 7A through 7H show a first detailed example embodiment of generating a prediction block of intra-prediction of the present invention;

FIG. 8 shows a second detailed example embodiment of generating a prediction block of intra-prediction of the present invention; and

FIG. 9 shows the structure of a bitstream generated from a video encoder according to an example embodiment of the present invention.

DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

Hereinafter, example embodiments of the present invention will be described in detail. The above and other objects, features and advantages of example embodiments of the present invention will become more apparent to those of

Unified Patents Exhibit 1001
Page 15 of 20

US 9,641,849 B2

5

ordinary skill in the art by describing in detail example embodiments thereof with reference to the attached drawings. However, example embodiments of the present invention is not limited to the embodiments disclosed below, but can be implemented in various forms. These embodiments are rather provided so that this disclosure will be through and complete, and will fully convey the scope of the invention to those skilled in the art. The scope of the invention is merely defined by the appended claims and its equivalents. In the following detailed description, the same reference numeral will be used for the same component or components regardless of the figures in order to facilitate understanding of example embodiments of the invention.

There are two types of data, which are to be encoded after intra-prediction. One of them is texture data of a residual block generated by a difference between a block predicted from neighboring blocks and a current block, and the other is intra mode information applied to each block. An intra-prediction method proposed by example embodiments of the present invention is intended to provide technology for performing the intra-prediction without the intra mode information. In example embodiments of the present invention, the term "block" will be used as concept covering a macroblock or a sub-block (8×8 block or 4×4 block) having a smaller size than the macroblock.

FIG. 5 is a block diagram showing the construction of a video encoder 200 according to an example embodiment of the present invention.

The video encoder 200 may include a block divider 205, a mode selector 210, an intra-predictor 215, a spatial transformer 220, a quantizer 230, an entropy encoder 240, and a closed-loop decoder 250.

The block divider 205 divides an input image into blocks of a predetermined size. The size of each block may be 4×4, 8×8, or 16×16 according to whether the input image is a chrominance signal or a luminance signal, or according to a different condition. In example embodiments of the present invention, the description will be made on the assumption that a current block to be encoded is a block having a 4×4 size and has a total of nine intra modes (mode 0 through mode 8). Further, the divided blocks may be formed by symmetrical partition in a square shape of 4×4, 8×8, or 16×16, or by asymmetrical partition in various geometrical shapes such as a rectangular shape of 4×16, 12×16, 24×32, 8×32, 16×64, or 48×64, an "L" shape, a triangular shape, and so on.

The mode selector 210 according to an example embodiment of the present invention selects a mode suitable for the current block from among a plurality of intra modes using "directionality" of neighboring blocks of the current block. The neighboring blocks have already been reconstructed before the current block is reconstructed. This method of selecting the mode is different from a method of calculating a cost of each mode for the current block on the basis of a rate-distortion cost as in the conventional H.264 and then selecting the mode that minimizes this cost.

In detail, since the video decoder cannot directly use information about the current block to be reconstructed unlike the video encoder, information that can be used in common between the video encoder and the vide decoder should be used. This is because, unlike the conventional H.264, the intra mode information is not encoded in an example embodiment of the present invention. That is, in an example embodiment of the present invention, unlike the conventional H.264, the encoder does not transmit the intra mode information, and the decoder can obtain an optimal intra mode, in which a cost function is minimized on the

6

basis of the directionality of the neighboring blocks that have already been reconstructed before the current block is reconstructed, for the current block, and thereby perform the intra-prediction. Alternatively, in another example embodiment of the present invention, the encoder may obtain an optimal intra mode, in which a cost function is minimized on the basis of the directionality of the neighboring blocks that have already been reconstructed, for the current block, and then may transmit the obtained intra mode information to the decoder.

In detail, an example embodiment of the present invention employs a method of selecting the intra mode of the current block on the basis of the directionality of at least one of the neighboring blocks that have already been reconstructed. Here, the directionality of the neighboring block(s) may refer to, for instance, an optimal direction, which is estimated from the neighboring blocks, among the nine directions as in H.264 (rather than a method of directly calculating the cost of the current block unlike H.264). That is, the intra-prediction according to an example embodiment of the present invention selects the intra mode of the current block on the basis of the directionality of the neighboring blocks that have already been reconstructed. By contrast, the existing H.264 is different from example embodiments of the present invention in that it employs a method of performing the intra-prediction on the current block using the nine intra modes and selecting the intra mode having a minimum cost, rather than the method of selecting the intra mode of the current block on the basis of the directionality of the neighboring blocks that have already been reconstructed as in example embodiments of the present invention.

The image associated with the neighboring blocks is information that can be used in common in the video encoder as well as the video decoder. However, to be completely matched with the video decoder, the neighboring blocks are preferably obtained from an image reconstructed by closed-loop decoding, i.e. encoding and decoding, rather than obtained from the original input image.

The closed-loop decoder 250 serves to provide this image, which is reconstructed for the neighboring blocks, to the mode selector 210. The closed-loop decoder 250 obtains an image reconstructed by performing dequantization and inverse spatial transform on the result quantized by the quantizer 230 again, and then inversely performing original coding (inter coding, intra coding, or the like) on the result obtained by the inverse spatial transform. Note that, because the current block is predicted by the intra coding, its neighboring blocks are all subjected to the intra coding, and then the image does not need to be reconstructed. Thus, it does not matter that the neighboring blocks are obtained from the image, which is reconstructed after being encoded by inter coding, intra coding, or other coding.

It has been described that the mode selector 210 selects the mode suitable for the current block using the directionality of the neighboring blocks. This description will be made below in greater detail with reference to FIG. 7.

The intra-predictor 215 obtains a prediction block of the current block according to the intra mode selected by the mode selector 210, and subtracts the obtained prediction block from the current block, thereby obtaining a residual block (residual signal). Once the intra mode (e.g. one of the nine modes of FIG. 4) is determined by the mode selector 210, the prediction block can be obtained according to the determined intra mode using the same method as in the conventional H.264 of FIG. 4 (in the case of the luminance signal, the nine intra modes are used for the 4×4 block, and the four intra modes are used for the 16×16 block; in the case

Unified Patents Exhibit 1001
Page 16 of 20

US 9,641,849 B2

7

of the chrominance signal, the four intra modes are used for the 8×8 block). Example embodiment of the present invention is not limited to this method. Thus, the prediction block may be obtained by another codec than H.264.

Here, as an example of the other codec than H.264, in the case of the 8×8 block, the intra-prediction may be performed using 34 modes. Here, the 34 modes may represent a maximum of 34 directions, each of which is an arbitrary direction with respect to an arbitrary pixel within the current block. The arbitrary direction has a slope defined as dy in a vertical direction over dx in a horizontal direction (where dx and dy are natural numbers).

As another example of the other codec than H.264, a different number of intra modes may be used according to a block size. For example, 9 intra modes may be used for a 4×4 block, 9 intra modes may be used for an 8×8 block, 34 intra modes may be used for a 16×16 block, 34 intra modes may be used for a 32×32 block, 5 intra modes may be used for a 64×64 block, and 5 intra modes may be used for a 128×128 block.

The residual block obtained by the intra predictor 215 is provided to the spatial transformer 220 in order to perform spatial transform such as discrete cosine transform (DCT).

Although not shown in FIG. 5, the video encoder 200 may further include an inter predictor. The inter predictor performs inter-prediction on the blocks divided by the block divider 205. That is, the inter predictor can estimate motion for the divided blocks in units of blocks and generate motion vectors. Here, the divided blocks used for the motion estimation may vary in size. The divided blocks may be formed by symmetrical partition in a square shape of 4×4, 8×8, or 16×16, or by asymmetrical partition in various geometrical shapes such as a rectangular shape of 4×16, 12×16, 24×32, 8×32, 16×64, or 48×64, an "L" shape, a triangular shape, and so on. The inter predictor may perform motion compensation using the generated motion vector and a reference picture, and generate a prediction block.

Although not shown in FIG. 5, the video encoder 200 may further include a subtractor, which subtracts the prediction block provided by the inter predictor from the current block and generates a residual value. The inter-prediction and the intra-prediction may be selectively used for each block.

The spatial transformer 220 removes spatial redundancy from the residual block provided by the intra predictor 215 using spatial transform. As this spatial transform, discrete cosine transform (DCT) or wavelet transform may be used. A coefficient obtained by the spatial transform is referred to as a transform coefficient. Particularly, when the DCT is used as the spatial transform, the transform coefficient is referred to as a DCT coefficient.

The quantizer 230 quantizes the transform coefficient obtained by the spatial transformer 220. The quantizing process refers to a process of dividing the transform coefficient expressed by an arbitrary real number value by a constant section, representing the divided transform coefficient by a discrete value, and matching it with a predetermined index. Particularly, when the wavelet transform is used as the spatial transform, embedded quantization may be used as the quantization.

The entropy encoder 240 losslessly encodes the transform coefficient quantized by the quantizer 230, the difference value which is the residual value, between the prediction block provided by the inter predictor and the current block, or the direction difference provided by the intra predictor 215, and generates a bitstream. As the lossless coding, arithmetic coding, variable length coding, Huffman coding, etc. may be used.

8

FIG. 6 is a block diagram showing the construction of a video decoder 500 according to an example embodiment of the present invention.

The video decoder 500 may include an entropy decoder 510, a dequantizer 520, an inverse spatial transformer 530, a mode selector 540, an intra reconstructor 550, and an inter reconstructor 560.

The entropy decoder 510 performs lossless decoding that is reverse to entropy encoding, and extracts motion data (data relevant to motion vector and reference frame information) in the inter-prediction. The extracted texture data is provided as a quantization coefficient to the dequantizer 520, and the motion data is provided to the inter reconstructor 560.

The dequantizer 520 dequantizes the quantization coefficient transmitted from the entropy decoder 510. The dequantizing process refers to a process of searching for the transform coefficient matched with the value expressed and transmitted by the predetermined index at the stage of the video encoder 200. A table representing a matching relation between the indices and the transform coefficients may be transmitted from the stage of the video encoder 200, and be previously set by arrangement between the encoder and the decoder.

The inverse spatial transformer 530 inversely performs spatial transform, and transforms a transform coefficient (frequency domain) provided by the dequantization into a residual signal in a spatial domain. For example, when the spatial transform is performed on the basis of the wavelet transform at the stage of the video encoder, the inverse spatial transformer 530 will perform inverse wavelet transform. When the spatial transform is performed on the basis of the DCT at the stage of the video encoder, the inverse spatial transformer 530 will perform inverse DCT.

The mode selector 540 selects a mode suitable for the current block from among the nine intra modes using the directionality of the neighboring blocks of the current block which have already been reconstructed. Of course, the neighboring blocks may be blocks that are reconstructed by the intra reconstructor 550 or that are to be reconstructed by the inter reconstructor 560. In this manner, the method of determining the intra mode at the mode selector 540 is identical to that of selecting the intra mode at the mode selector 210 of the video encoder 200. Thus, according to an example embodiment of the present invention, the video decoder 500 need not receive information about the intra mode from the video encoder 200. It has been described that the mode selector 540 selects the mode suitable for the current block using the directionality of the neighboring blocks. This description will be made below in greater detail with reference to FIG. 7.

The intra reconstructor 550 obtains a prediction block of the current block according to the intra mode selected by the mode selector 540, adds the prediction block and the residual signal of the current block provided from the inverse spatial transformer 530, and reconstructs the current block. Once the intra mode is determined by the mode selector 540, the prediction block can be obtained according to the determined intra mode (e.g., using the same method as in the conventional H.264 of FIG. 4 or another codec than H. 264 described above).

Meanwhile, to reconstruct the current block from the inter-prediction, the inter reconstructor 560 is used. This is because, although the current block will be reconstructed by the intra-prediction, it does not matter by which method its neighboring blocks are decoded.

Unified Patents Exhibit 1001
Page 17 of 20

US 9,641,849 B2

9

The inter reconstructor **560** performs motion compensation on the previously reconstructed frame using the motion data provided from the entropy decoder **510**, and generates a motion-compensated frame. Of course, this motion compensating process is applied only when the current block to be reconstructed is encoded through the inter-prediction process at the stage of the video encoder. Further, when the residual block reconstructed by the inverse spatial transformer **530** is generated by the inter-prediction, the inter reconstructor **560** adds the residual block and a domain corresponding to it within the motion-compensated frame, and thereby reconstructs the current block.

As described above, when the blocks reconstructed by the intra reconstructor **550** and the inter reconstructor **560** are assembled, the reconstructed frame can be finally completed.

Up to now, each component of FIGS. **5** and **6** may refer to software or hardware such as a field-programmable gate array (FPGA) or an application-specific integrated circuit (ASIC). However, these components are not limited to the software or hardware, and thus may be constructed so as to be present in an addressable storage medium or to enable one or more processors. Functions provided within the components can be implemented by subdivided components or one component that combines a plurality of components to perform a specific function.

FIGS. **7**A through **7**H show a detailed method of a mode selector **210** or **540** selecting a mode suitable for a current block from among a plurality of intra modes using directionality of neighboring blocks of the current block which have already been reconstructed in accordance with an example embodiment of the present invention. The neighboring blocks may include blocks that have already been reconstructed. For example, the neighboring blocks may include an upper block, a left block, an upper left block, and an upper right block, all of which have already been reconstructed with respect to the current block by the same method as H.264.

First, the mode selector **210** or **540** calculates a cost $C_i$ with respect to a specific directionality i by means of a sum (or an average) of deviations according to the directionalities using Equation 2 below.

$$C_i = \sum_{k=0}^{n-1} D_{ik} \qquad \text{[Equation 2]}$$

In Equation 2, n is the number of pixel pairs k for calculating the deviation, i is the intra mode number, and $D_{ik}$ is the deviation between the pixel pairs k corresponding to the specific directionality i. The symbol n may be selected by another number depending on an embodiment. In example embodiments of the present invention, the description will be made on the assumption that n is set to 12.

FIG. **7**A shows an example of calculating a cost of a vertical direction. The cost $C_0$ of the vertical direction is obtained by selecting 12 pixel pairs in the vertical direction from among adjacent pixels of the neighboring blocks of the current block, and calculating a sum of deviations with respect to each pixel pair as in Equation 2. Of course, the pixels of one pixel pair may overlap with those of the other pixel pair. For example, in FIG. **7**A, the pixel **03_03** makes a pair with the pixel **02_03** and a pair with the pixel **04_03**.

In this manner, the process of calculating the cost of the specific direction is equally applied as in FIGS. **7**B through

10

**7**H. However, the pixel pair is formed between the adjacent pixels in the case of FIGS. **7**A through **7**D, whereas the pixel pair may be formed between the pixels that are not adjacent to each other in the case of FIGS. **7**E through **7**H. This is because, in the case of FIGS. **7**E through **7**H, a slope is ±2 or ±½ . Of course, a method of interpolating the adjacent pixels without using the separated pixels is possible. For example, it is shown in FIG. **7**E that the pixel **03_04** makes a pair with the pixel **01_03**, but the pixel **03_04** may make a pair with half pixels interpolated from the pixel **02_03** and the pixel **02_04**.

Meanwhile, in regard to the eight modes having directionality among the nine intra modes, the cost $C_i$ , of each directionality can be calculated by forming the pixel pair as in FIGS. **7**A through **7**H and substituting the formed pixel pair into Equation 1. However, since the cost $C_2$ of mode **2** of the intra modes is calculated by an average without directionality, $D_{ik}$ (i=2) of Equation 2 can be obtained from Equation 3 below.

$$D_{2k} = |\mu - P_k| \qquad \text{[Equation 3]}$$

Here, $P_k$ is the value of the k-th pixel among the n pixels selected from the neighboring blocks, and μ is the average of the pixel values, i.e. $1/n \times \Sigma P_k$. When $D_{2k}$ obtained in this way is substituted into Equation 2, the cost $C_2$ of mode **2** can be finally calculated.

FIG. **8** shows an example of selecting n pixels from neighboring blocks in order to calculate a cost of mode **2**. Since n is set to 12 in the embodiments of FIGS. **7**A through **7**H, a total of 12 adjacent pixels are selected in FIG. **8** so as to correspond to the set value.

The mode selector **210** or **540** can calculate the costs $C_i$ of a total of nine intra modes as shown in the embodiments of FIGS. **7**A through **7**H and **8**, and then select one having a minimum cost from among the intra modes. Since this selected intra mode is obtained without using information about the current block, it can be used in common for the video encoder **200** and the video decoder **500**.

In example embodiments of the present invention, the directionality of the neighboring blocks is used to select the intra mode suitable for the current block. This starts on the assumption that the directionalities of the small-sized neighboring blocks such as 4×4 blocks are similar to each other. Of course, when the directionality of the neighboring block is different from that of the current block, there is a possibility of the energy of a residual increasing compared to the existing H.264. This possibility is nothing but a problem of trade-off for benefits obtained by not encoding the intra mode information. However, since the intra mode information should be encoded in units of a small size of 4×4, an amount of bits reduced by omitting the encoding is considerable. As such, if a difference between the directionalities of the neighboring block and the current block is not great, the method of example embodiments of the present invention can be regarded to be efficient. Further, if a plurality of (typically, four) neighboring blocks rather than a single neighboring block are referred to, it is possible to minimize the difference between the directionalities of the neighboring block and the current block.

FIG. **9** shows the structure of a bitstream **150** according to an example embodiment of the present invention. In H.264, such a bitstream is encoded in units of slices. The beat stream **150** may include a slice header **160** and slice data **170**. The slice data **170** is made up of a plurality of macroblock data (MB) **171** to **174**. Further, one **173** of the MBs may be made up of an mb_type field **180**, an mb_pred field **185**, and a texture data field **189**.

Unified Patents Exhibit 1001
Page 18 of 20

US 9,641,849 B2

11 | 12

Here, the mb_type field **180** is recorded with a value indicating a type of the macroblock. In other words, the value indicates whether a current macroblock is an intra macroblock or an inter macroblock.

Further, the mb_pred field **185** is recorded with a detailed prediction mode based on the macroblock type. In the case of the inter macroblock, information about a reference frame number and a motion vector is recorded according to each macroblock partition. However, in example embodiments of the present invention, in the case of the intra macroblock, the selected intra mode does not need to be recorded in this field, unlike the conventional H.264. In other words, in the case of the intra macroblock, the mb_pred field **185** can be omitted.

In the case of the conventional H.264, the mb_pred field **185** includes block information fields **191** to **194** for recording the intra mode according to each block (4×4 block). In the intra macroblock according to example embodiments of the present invention, these block information fields are omitted, so that it is possible to remarkably reduce a size of the bitstream.

Like the conventional H.264, the texture data field **189** is recorded with encoded residual signals, i.e. texture data.

According to example embodiments of the present invention, in comparison with an existing H.264 standard, since the intra mode information is not coded while using intra-prediction coding as it stands, it is greatly reduce the overhead of a bitstream transmitted from an encoder to a decoder.

Thus, when the coded bitstreams are identical in size, it is possible to provide a higher quality to an image reconstructed at the stage of a video decoder.

While the invention has been shown and described with reference to certain example embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the spirit and scope of the invention as defined by the appended claims. Therefore, it is to be understood that the embodiments described herein are illustrative in every respect and not restrictive.

What is claimed is:

**1**. A video decoding method performed by a video decoding apparatus, the method comprising:

determining an intra mode for a neighboring block of a current block;

determining an intra mode for the current block based on whether the intra mode for the neighboring block is a directional mode or a non-directional mode;

performing intra-prediction according to the intra mode for the current block to generate a prediction block for the current block;

obtaining quantization coefficients from an input bitstream;

dequantizing the quantization coefficients to generate transform coefficients;

transforming the transform coefficients to a residual block for the current block; and

adding the prediction block and the residual block to reconstruct the current block,

wherein the intra mode for the current block is determined by using a first set of one or more mathematical expressions, if the intra mode for the neighboring block is the non-directional mode,

wherein the intra mode for the current block is determined by using a second set of one or more mathematical expressions, if the intra mode for the neighboring block is the directional mode, and

wherein the second set of one or more mathematical expressions is different from the first set of one or more mathematical expressions.

**2**. The video decoding method of claim **1**,

wherein the non-directional mode includes a DC mode.

**3**. The video decoding method of claim **1**,

wherein the second set of one or more mathematical expressions use the intra mode for the neighboring block.

**4**. The video decoding method of claim **1**,

wherein determining the intra mode for the current block comprises:

determining candidate intra modes based on whether the intra mode for the neighboring block is the directional mode or the non-directional mode; and

selecting the intra mode for the current block among the candidate intra modes.

**5**. The video decoding method of claim **4**,

wherein the candidate intra modes are determined by using the first set of one or more mathematical expressions, if the intra mode for the neighboring block is the non-directional mode, and

wherein the candidate intra modes are determined by using the second set of one or more mathematical expressions, if the intra mode for the neighboring block is the directional mode.

**6**. The video decoding method of claim **5**, wherein selecting the intra mode for the current block from among the candidate intra modes comprises:

obtaining information for selecting the intra mode for the current block among the candidate intra modes; and

selecting the intra mode for the current block among the candidate intra modes based on the obtained information.

**7**. The video decoding method of claim **1**,

wherein determining the intra mode for the current block comprises:

selecting the intra mode for the current block among a plurality of intra modes, based on whether the intra mode for the neighboring block is the directional mode or the non-directional mode,

wherein the number of the plurality of intra modes for a 32×32 block is equal to the number of intra modes for a 16×16 block, and the number of the plurality of intra modes for the 32×32 block is equal to the number of intra modes for an 8×8 block.

**8**. The video decoding method of claim **7**,

wherein the number of the plurality of intra modes is greater than 9 corresponding to the number of a plurality of intra modes specified in the H.264 standard.

**9**. The video decoding method of claim **8**,

wherein the plurality of intra modes includes a plurality of directional modes, each of the plurality of directional modes has a direction, the direction has a slope defined as dy in a vertical direction over dx in a horizontal direction, and dx and dy are integer numbers.

**10**. A video encoding method performed by a video encoding apparatus, the method comprising:

determining an intra mode for a neighboring block of a current block;

determining an intra mode for the current block based on whether the intra mode for the neighboring block is a directional mode or a non-directional mode;

performing intra-prediction according to the intra mode for the current block to generate a prediction block for the current block;

Unified Patents Exhibit 1001
Page 19 of 20

US 9,641,849 B2

13        14

subtracting the prediction block from the current block to obtain a residual block for the current block;

transforming the residual block to transform coefficients;

quantizing the transform coefficients to generate quantization coefficients;

encoding the quantization coefficients to generate an input bitstream,

wherein the intra mode for the current block is determined by using a first set of one or more mathematical expressions, if the intra mode for the neighboring block is the non-directional mode,

wherein the intra mode for the current block is determined by using a second set of one or more mathematical expressions, if the intra mode for the neighboring block is the directional mode, and

wherein the second set of one or more mathematical expressions is different from the first set of one or more mathematical expressions.

**11**. The video encoding method of claim **10**,

wherein the non-directional mode includes a DC mode.

**12**. The video encoding method of claim **10**,

wherein the second set of one or more mathematical expressions use the intra mode for the neighboring block.

**13**. The video encoding method of claim **10**,

wherein determining the intra mode for the current block comprises:

determining candidate intra modes based on whether the intra mode for the neighboring block is the directional mode or the non-directional mode; and

selecting the intra mode for the current block among the candidate intra modes.

**14**. The video encoding method of claim **13**,

wherein the candidate intra modes are determined by using the first set of one or more mathematical expressions, if the intra mode for the neighboring block is the non-directional mode, and

wherein the candidate intra modes are determined by using the second set of one or more mathematical expressions, if the intra mode for the neighboring block is the directional mode.

**15**. The video encoding method of claim **14**, wherein selecting the intra mode for the current block from among the candidate intra modes comprises:

obtaining information for selecting the intra mode for the current block among the candidate intra modes; and

selecting the intra mode for the current block among the candidate intra modes based on the obtained information.

**16**. The video encoding method of claim **10**,

wherein determining the intra mode for the current block comprises:

selecting the intra mode for the current block among a plurality of intra modes, based on whether the intra mode for the neighboring block is the directional mode or the non-directional mode,

wherein the number of the plurality of intra modes for a 32×32 block is equal to the number of intra modes for a 16×16 block, and the number of the plurality of intra modes for the 32×32 block is equal to the number of intra modes for an 8×8 block.

**17**. The video encoding method of claim **16**,

wherein the number of the plurality of intra modes is greater than 9 corresponding to the number of a plurality of intra modes specified in the H.264 standard.

**18**. The video encoding method of claim **17**,

wherein the plurality of intra modes includes a plurality of directional modes, each of the plurality of directional modes has a direction, the direction has a slope defined as dy in a vertical direction over dx in a horizontal direction, and dx and dy are integer numbers.

* * * * *

Unified Patents Exhibit 1001
Page 20 of 20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2022, a true and correct copy of the

foregoing was timely filed with the Clerk of the Court using the appellate CM/ECF

system, which will send notifications to all counsel registered to receive electronic

notices.

*/s/ Kayvan Noroozi*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Federal Rule of

Appellate Procedure 32(f) and the Rules of this Court, because it contains

12,021 words (as determined by the Microsoft Word for Mac 2020 word-

processing system used to prepare the brief), excluding the parts of the brief

exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of

Appellate Procedure 32(a)(6) and the Rules of this Court because it has been

prepared in a proportionally spaced typeface using the Microsoft Word for Mac

2020 word-processing system in 14-point Roman font.

*/s/ Kayvan Noroozi*